MOBIL OIL CORPORATION,
Plaintiff-Appellant,

v.

FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Administrator, Federal Energy Administration, Defendants-Appellees.

No. 5–25.

Temporary Emergency Court of Appeals.

Argued Sept. 23, 1977.

Decided Nov. 23, 1977.

Leo J. Hoffman, Strasburger & Price, Dallas, Tex., with whom Charles S. Lindberg and Richard L. Hoffman, New York City, were on the brief, for plaintiff-appellant.

Bruce G. Forrest, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Stanley D. Rose,* Washington, D. C., were on the brief, for defendants-appellees.

Before CHRISTENSEN, INGRAHAM and JAMESON, Judges.

---

* Mr. Stanley D. Rose died after the submission of the case but before this opinion was filed.

JAMESON, Judge:

This appeal presents the question of whether the Emergency Petroleum Allocation Act of 1973 (EPAA)[1] authorizes the Federal Energy Administration (FEA) to provide for the allocation and price control of natural gas liquids, including condensate. The appellant, Mobil Oil Corporation, brought suit for declaratory and injunctive relief, alleging that FEA is without authority to regulate the liquid hydrocarbon products recovered from natural gas and that the regulations and orders of the FEA purporting to do so are invalid.

In a well reasoned opinion the district court granted FEA's motion for summary judgment.[2] The court concluded that under the EPAA the FEA has authority "to regulate the allocation and pricing of all liquid petroleum products recovered from the 'wet' natural gas stream, including condensate, natural gas liquids and natural gas liquid products recovered at gas processing plants (propane, butane, and natural gasoline) except ethane, which is expressly exempted from regulation by Section 3(6) of the Act    .    .    .." We affirm.

## CONTENTIONS ON APPEAL

Mobil contends that (1) the authority granted the FEA under the Allocation Act "extends only to liquid hydrocarbons produced from oil wells (i. e., 'crude oil,') and the products of refineries which refine such crude oil (i. e. 'residual fuel oil and refined products')" and not "to natural gas or any of the liquid hydrocarbon substances which are recovered from natural gas"; (2) issues of material fact were developed in the dis-

trict court with respect to the meanings of the terms "condensate" and "natural gas liquids" in the industry, and summary judgment accordingly was improper; and (3) in the alternative, if this court agrees with the district court that there are no genuine issues of material fact, the decision of the district court should be reversed and Mobil's motion for summary judgment be granted. Preliminary to a consideration of these contentions, we set forth a description of the products involved and relevant statutes, regulations and orders.

## DESCRIPTION OF NATURAL GAS LIQUIDS

Natural gas liquids are the liquified hydrocarbons recovered from "wet" natural gas. They include, but are not limited to, ethane, propane, butane, propane-butane mixtures, pentanes, natural gasoline and condensate.

Condensate exists as a natural gas in the underground reservoir and is condensed from the gas and recovered as a liquid. It is mechanically extracted from the natural gas produced from gas wells by separators located at the wellhead, a central facility in the field, or at a gas processing plant before the remainder of the gas stream is processed.[3] It consists primarily of the heavier hydrocarbon compounds and is used as a refinery and petrochemical plant feedstock. It is generally considered the equivalent of a light crude oil.[4]

After the condensate has been extracted, the liquid hydrocarbons are fractionated at a gas processing plant into the component

1. Pub.L.No. 93–159 (1973) (15 U.S.C. § 751 *et seq.*).

2. Mobil resisted FEA's motion for summary judgment, but the district court ruled that the case should be decided on the basis of cross-motions for summary judgment. Mobil then moved for summary judgment in its favor, reserving, however, its position that there were genuine issues of material facts and that disposition by summary judgment was improper. Both parties submitted briefs and extensive affidavits in support of their motions.

3. Condensate extracted at the wellhead or field facility is termed "field " or "lease" condensate. Condensate separated at a gas plant is referred to as "plant" condensate.

4. While Mobil contends that the industry has never considered condensate to be a light crude oil, it does not deny that condensate is often commingled with crude oil and used in a similar manner as crude oil. Nor does it contest FEA's statement that the Bureau of Mines classifies condensate as crude oil for statistical purposes.

parts—ethane, butane, propane and natural gasoline.[5] Ethane, butane and propane are also recovered from crude oil in oil refineries as a result of molecular changes occurring in the refining process. These refinery gases are chemically indistinguishable from the hydrocarbons extracted from natural gas streams and are used for the same purposes.[6] Approximately 70% of all propane and butane is produced at gas processing plants.

Ethane is an important petrochemical feedstock. Propane has a variety of uses, including crop drying and other agricultural purposes, as a refinery and petrochemical feedstock, and for residential or commercial heating and cooking, particularly in rural areas. Butane may be sold separately or be blended with propane and sold as liquified petroleum gas. Its major use is as a refinery blending agent for motor gasoline. It is also used as a feedstock for manufacturing petrochemicals.

Natural gasoline, like condensate, may be derived only from natural gas streams and not from crude oil. Natural gasoline is composed of nearly the same hydrocarbon components as ordinary motor gasoline, but in different proportions. It contains more of the lighter, more volatile hydrocarbons and is used as a blending agent in producing motor gasoline.

## THE STATUTORY AND REGULATORY FRAMEWORK

It is undisputed that prior to the enactment of the EPAA in November, 1973, natural gas liquids, including condensate, were subject to governmental regulation under the Economic Stabilization Act of 1970. 12 U.S.C. § 1904 note. Section 203 of the Stabilization Act authorized the President to issue orders and regulations to "stabilize

prices, rents, wages, and salaries . . ." and to provide after public hearing "for the establishment of priorities of use and for systematic allocation of supplies of petroleum products including crude oil . . . ."

The President by Executive Order had delegated that authority to the Cost of Living Council (COLC), and the COLC had promulgated Phase IV price regulations which applied to all "covered products". 6 C.F.R. Part 150, Subpart L, 38 Fed.Reg. 22536 (August 22, 1973). Covered products included all products described in the 1972 Standard Industrial Classification Manual Industry Code 1311 (except natural gas), 1321 or 2911. Code 1311 referred to production and extraction of crude petroleum and natural gas, 1321 referred to production and recovery of natural gas liquids, and 2911 referred to petroleum refining. Price regulation of natural gas liquids was covered by the broad definition of "refiner" in the regulations. The term included a firm that "refines liquid hydrocarbons from oil and gas field gases . . . ." 6 C.F.R. § 150.132.

With regard to allocation regulations, the Government initially determined not to exercise its authority under the Stabilization Act. Instead, the Government encouraged the petroleum industry to cooperate in a voluntary allocation program. On May 21, 1973, the Office of Oil and Gas in the Department of Interior issued guidelines for the voluntary allocation of "crude oil and refinery products". 38 Fed.Reg. 13599 (May 23, 1973). The guidelines authorized the Office of Oil and Gas to "request each producer, crude oil buyer, *gas plant operator*, refiner, marketer, jobber and distributor to provide allocations for priority customers still unable to obtain needed supplies of crude oil and products". (Emphasis added).

---

**5.** After extraction of the liquid hydrocarbons, the remaining gas consists primarily of methane—the lightest hydrocarbon.

**6.** Refinery gas will contain some impurities not found in natural gas liquids, but the hydrocar-

bon molecules are the same. When produced at a crude oil refinery, propane and butane and mixtures thereof are usually referred to as "liquified refinery gas" (LRG). When produced at a gas processing plant they are known as "liquified petroleum gas". (LPG).

In August, 1973, however, the Energy Policy Office (EPO) [7] issued a notice of proposed rulemaking to adopt a "Mandatory Fuel Allocation Program". 38 Fed.Reg. 21797 (Aug. 13, 1973). The Program comprised Subpart A, a "Mandatory Allocation Program for Crude Oil," and Subpart B, a "Mandatory Allocation Program for Refined Petroleum Products and Liquified Petroleum Gases". The scope of Subpart B clearly embraced the allocation of the products of "gas plant operators". These regulations, however, were not adopted before the passage of the EPAA in November, 1973.

The EPAA, approved by the President on November 27, 1973, required the President to promulgate regulations for the mandatory allocation of "crude oil, residual fuel oil, and each refined petroleum product" [8] within 15 days after enactment. The regulations were to take effect not later than 15 days after their promulgation. 15 U.S.C. § 753(a). The regulations were to achieve "to the maximum extent practicable" nine general objectives, including the following:

(A) protection of public health . . ., safety, and welfare (including maintenance of residential heating . . .), and the national defense;

(B) maintenance of all public services . . . ;

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry . . . ;

. . . . .

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry . . . ;

(G) allocation of residual fuel oil and refined petroleum products in such amounts, and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States and for required transportation related thereto.

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1).

The President immediately established the Federal Energy Office (FEO), the predecessor of the FEA, and delegated to it his authority under the Act. He ordered the COLC to delegate its petroleum regulatory authority under the Stabilization Act to the FEO. Exec. Order 11748, 39 Fed. Reg. 33575 (Dec. 6, 1973). Pursuant to that delegation of authority, the FEO promulgated its Mandatory Petroleum Allocation and Price Regulations. 39 Fed.Reg. 1924 (Jan. 15, 1974). The price regulations it adopted merely carried forward the Phase IV price regulations of the COLC. The definitions of "covered product" and "refiner" under the FEO price regulation program were identical to the definitions in the COLC regulations. 10 C.F.R. § 212.31.

Prior to the expiration of the Stabilization Act on April 30, 1974, the FEO amended its petroleum price regulations to exclude those products which had been within the scope of the Stabilization Act, but which the FEO believed Congress did not intend it to regulate under the EPAA, namely petroleum wax, petroleum coke, asphalt, road oil, and refinery gases. 39 Fed. Reg. 12353 (April 5, 1974) (to be codified in 10 C.F.R. § 210.34). At the same time it amended its definition of "covered prod-

---

7. The EPO was established by the President in 1973 to deal with fuel shortages and develop an allocation program.

8. 15 U.S.C. § 752(5) defines "refined petroleum product" as "gasoline, kerosene, distillates (in-

cluding Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel". Subsection (6) states that "LPG" means "propane and butane, but not ethane".

ucts" to mean "crude oil, residual fuel oil, and refined petroleum products", and thereby conform the definition to the statutory language of the EPAA. *Id.* Notably it did not amend its broad definition of "refiner" which included a firm which "refines liquid hydrocarbons from oil and gas field gases . . .."

With regard to the allocation regulations mandated by the EPAA, the FEO program promulgated January 15, 1974, was very similar to the program proposed but never adopted by the EPO in August, 1973.

With its signing on June 27, 1974, the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 *et seq.*, established the FEA and transferred to it the authority of the FEO. Since its creation, the FEA has modified and clarified its petroleum price and allocation regulations, but at all times has asserted its power to regulate natural gas liquids, including condensate. For example, after eliciting written comments and conducting a public hearing on its definition of covered products, on January 10, 1975, the FEA adopted a new definition to provide more specific guidance.

> "Covered products" means aviation fuels, benzene, butane, crude oil, gas oil, gasoline, greases, hexane, kerosene, lubricant base oil stocks, lubricants, naphthas, *natural gas liquids, natural gasoline*, No. 1 heating oil and No. 1–D diesel fuel, No. 2 heating oil and No. 2–D diesel fuel, No. 4 fuel oil and No. 4–D diesel fuel, propane, residual fuel oil, special naphthas (solvents), toluene, unfinished oils, sylene, and other finished products. (Emphasis added)

40 Fed.Reg. 2795, 2796 (Jan. 16, 1975) (codified in 10 C.F.R. §§ 210.21, 212.31).

In adopting this explicit definition, however, the FEA made it clear that it did not intend to "broaden or narrow the scope of the regulations, or to include any products

for the first time". *Id.* at 2795. At the same time it added and modified other definitions to the price regulations in 10 C.F.R. § 212.31, including *inter alia*, "crude oil" (which expressly refers to "lease condensate, which is a natural gas liquid . . ."), "natural gas liquids," and "natural gasoline".

Prior to these changes, the FEA had recognized that its "refiner" price regulations which applied to gas processors as well as petroleum refiners were not well-suited for regulating the former because the operations of gas plants were quite different from those of a refinery. See 39 Fed.Reg. 32718, 32719 (Sept. 10, 1974). The FEA concluded that it was necessary to promulgate special price regulations for natural gas liquids in order to maintain prices as low as possible, but yet not affect the availability of the products. After giving notice, the FEA issued special price regulations for natural gas liquids and natural gas liquid products on December 19, 1974, effective January 1, 1975. 39 Fed.Reg. 44407 (Dec. 24, 1974).

It is these allocation and price regulations which Mobil contends exceed the statutory authority of the FEA. Before determining the merits of Mobil's claim, it is necessary to consider the propriety of the district court's deciding the case on cross-motions for summary judgment.

## SUMMARY JUDGMENT

Mobil argues that summary judgment was improper because (1) there are substantial issues of material fact concerning the meaning of technical terms in the usage of the petroleum industry which must be resolved; and (2) a case of this nature, involving complex issues of public policy and having far reaching consequences, demands the full and complete factual exposition of a trial on the merits.[9]

---

**9.** In this contention, Mobil relies on *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). *Kennedy* involved the application of the Fair Labor Standards Act to munitions workers in a government owned plant. Resolution required construction of nearly 200

pages of contracts and the terms and intent of three statutes, and entailed an examination of the parties' understanding of the contracts and their course of dealing. The decision could have had substantial repercussions on the cost of World War II. We do not find the issue in

As the district court noted, the issue to be decided is solely a legal question of legislative construction. And that question is narrow: "the statute either does or does not comprehend liquid hydrocarbons from natural gas". A factual dispute over the industry's meaning of the statutory terms does not preclude summary judgment. The legal question is not what the terms mean in the trade, but what Congress intended when it used those terms. As the district court stated, "If Congress misconceived industry practice, that misconception, not actual practice, is the law."

To preclude summary judgment the disputed facts must be material. They must affect the outcome of the litigation. *Hahn v. Sargent,* 523 F.2d 461, 464 (1 Cir. 1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Industrial usage is simply one factor which the court below considered in determining the intended scope of the EPAA. The court accepted for the purposes of summary judgment all of Mobil's contentions about industrial usage and still determined that FEA's regulation of natural gas liquids was properly within its authority under the EPAA. The essential chemical composition of the substances at issue was not disputed and the legislative history relied upon by the court was a matter of record and not subject to dispute.

While we agree with Mobil that this case may have substantial and far-reaching consequences within the petroleum industry, we conclude that there was sufficient record before the district court to permit it to rule on the merits without taking further evidence. We agree with the court that a trial on the factual issues of industrial practice and usage "would only divert attention from more important considerations of legislative history. Under these circumstances, summary judgment provides an appropriate mechanism for disposing of a legal question of statutory construction in which the legislative history and policy are by far the most important considerations." See *Schlothan v. Alaska,* 276 F.2d 806, 815 (9 Cir.), *cert. denied* 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1022 (1960). See also 6 Moore's Federal Practice ¶ 56.16 at 56–661.

## MOBIL'S CONTENTIONS

As the district court noted, Mobil's arguments on the merits are well drawn. Like the district court, we do not dismiss them lightly. They may be summarized as follows:

The terms "crude oil", "residual fuel oil", and "refined petroleum products", when viewed in the context of the other terms and definitions in the EPAA, can only refer to crude oil and the products of crude oil. In standard, well-accepted industrial usage, neither "crude oil" nor "residual fuel oil" refer to natural gas liquids, and any FEA authority over natural gas liquid products must spring from the term "refined petroleum products."

"Refined petroleum products" are defined as "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel". 15 U.S.C. § 752(5). LPG is defined as "propane and butane, but not ethane". 15 U.S.C. § 752(6). Mobil acknowledges that LPG can refer generally to all liquid products of natural gas, but argues that, in context, it is apparent the term is used in the EPAA to refer only to the by-products from crude oil refining. Mobil points to other terms in the statute to support its contention that only this construction of the term LPG is consistent with the other terms.[10]

---

this case so complex and multi-faceted that *Kennedy* would be controlling.

**10.** In the definition section of the EPAA four terms precede the definitions of "refined petroleum products" and "LPG". 15 U.S.C. § 752. These four terms are "branded independent marketer", "non-branded independent marketer", "independent refiner", and "small refiner".

Mobil argues that these terms obviously relate exclusively to crude oil refining and the products of crude oil refining. For example, "branded independent marketer" and "non-branded independent marketer" refer to the traditional methods of marketing brand name refinery products through service station outlets. These definitions, which expressly deal with marketing "refined petroleum products"

Mobil contends that to be consistent all the petroleum products expressly included within the term "refined petroleum products" must be products of crude oil refining. Thus the inherent ambiguity in the term LPG should be resolved by construing it, for the purposes of the EPAA, to mean only the propane and butane by-products of crude oil refining. Because the petroleum industry uses "refine" solely in reference to the processing of crude oil, LPG recovered from wet natural gas streams cannot be within the FEA's jurisdiction.[11]

Mobil seeks support for this narrow construction of the EPAA by directing attention to the world events concomitant with passage of the EPAA. In November, 1973, the Arabs initiated the crude oil embargo which exacerbated existing shortages of vital fuels. Mobil acknowledges that Congressional debates evidence concern about shortages of propane and butane without regard to their source, but nonetheless asserts that by November the major and most urgent fuel problems related to motor gasoline and fuel oil. In that light, Mobil argues, Congress passed the EPAA as a narrow authority for the regulation of crude oil and its refined products and left other petroleum products such as natural gas liquids to be regulated under the broader terms of the Stabilization Act which was still in effect.

## IMPLIED POWERS—OBJECTIVES AND PURPOSES OF THE EPAA

■ We may assume that Mobil is correct in its representations with respect to the meaning in the petroleum industry of the terms used in the EPAA. In our opinion, however, industry usage does not necessarily erect a jurisdictional bar to the regulatory authority of the FEA or compel the technical construction of the Act for which Mobil contends. We must consider the FEA's assertion of authority to regulate

natural gas liquids under the EPAA in the light of the Act's broadly worded, comprehensive objectives, for it is well settled that "the width of administrative authority must be measured in part by the purposes for which it was conferred . . . ." *Permian Basin Area Rate Cases,* 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968). The Supreme Court has made it clear that "in the absence of compelling evidence that such was Congress' intention, [it is] unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes". *Id.* at 780, 88 S.Ct. at 1367. Agency action taken in pursuit of a legitimate statutory goal enjoys a "presumption of validity", and he who would upset it carries a "heavy burden". *FPC v. Texaco, Inc.,* 417 U.S. 380, 389, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). We conclude that Mobil has not carried that heavy burden and we find, as the district court did, that the FEA's arguments based on the general energy policy behind the EPAA are the more compelling.

In *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 359 (Em.App.), *cert. denied sub nom. Condor Operating Co. v. Zarb,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), this court, after examining the legislative history of the Act and its express statutory objectives, said:

Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate, the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate.

See also *Consumers Union, Inc. v. Sawhill,* 525 F.2d 1068, 1077 (Em.App.1975). "A

---

can not be construed as including the marketing of natural gas liquids since those products are not marketed under trademarks or trade names or through service station outlets.

11. It may be noted, however, that the COLC, the FEO and the FEA have consistently defined the term "refiners" to include, *inter alia,* a firm that "refines liquid hydrocarbons from oil and gas field gases . . . ." See 6 C.F.R. § 150.-132; 10 C.F.R. § 212.31.

proper interpretation of the Allocation Act and its provisions requires recognition of the fact that the authority under Section 4(a) [15 U.S.C. § 753] must be read together with the objectives which the exercise of that authority is to obtain." *Cities Service Co. v. FEA,* 529 F.2d 1016, 1022 (Em.App. 1975), *cert. denied* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976).

In *Marathon Oil Co. v. FEA,* 547 F.2d 1140, 1146 (Em.App.1976), *cert. denied* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), we held that "[d]etailed powers necessary or convenient to the allocation and pricing authority granted with reference to the petroleum industry *did not have to be spelled out,* for the Congress, as well as judges, was fully cognizant of the doctrine of implied powers. The mandating of regulations to achieve the broad objectives enumerated in the Act essentially entailed selection on the part of the agency of means in its judgment best suited, as to which the rule of deference for administrative decisions should not be departed from or grudgingly applied . . ." [12] (Emphasis added). (Footnotes omitted). Mobil attempts to distinguish *Marathon* by arguing that although the doctrine of implied powers can be invoked to sustain regulatory means or remedies chosen by an agency to effectuate ends expressly within the agency's subject matter jurisdiction, subject matter jurisdiction itself may not be supplied by inference.[13]

There is authority, however, for the extension of regulatory jurisdiction beyond the express terms of a statute. In *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), the Supreme Court considered whether community antenna television (CATV) systems were properly within the regulatory jurisdiction of the Federal Communications Commission (FCC). The enabling authority granted the FCC power to regulate common carriers and broadcasters, but made no specific mention of CATV systems.[14] Although it initially refused jurisdiction over CATV, with the growth of CATV, the FCC determined that regulation was necessary to achieve its statutorily mandated responsibilities. As a result, the FCC promulgated regulations to govern CATV and to prohibit the importation of such service into certain markets unless the FCC determined that it would be consistent with the public interest. After examining the legislative history and purposes of the enabling Act, the Court concluded that it could not follow the narrow construction urged by the CATV company. Instead, it found that successful performance of the agency's duties demanded regulation of CATV and the regulations promulgated were appropriate and "reasonably ancillary to the performance of the [agency's] various responsibilities . . ." *Id.* at 178, 88 S.Ct. at 2005.

Congress did not pass the EPAA for the limited reasons submitted by Mobil. Although enacted in November, 1973, the Act had its genesis long before the Arab oil embargo and had substantially broader goals than remedying that situation. As the district court noted, the Act was a "response to the shortage of heating oil in the winter of 1972–73; the shortage of gasoline during the summer of 1973; the resulting pressure on independent service stations whose supplies were being cut off by the major oil companies; and most pertinent to this case, the problems of farmers

---

**12.** We concluded in *Marathon* that lack of express authority in the EPAA for regulation of credit terms did not preclude FEA from requiring continuation of normal credit practices.

**13.** The cases relied on by Mobil are inapposite. All dealt with the construction of criminal statutes to which the rule of narrow construction in favor of the defendants controlled. See, *e. g., United States v. Resnick,* 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936).

**14.** Section 2(a) of the Communications Act, 47 U.S.C. § 152(a), provided: "The provisions of this chapter shall apply to all interstate and foreign communications *by wire or by radio* . . . ." (Emphasis added). The CATV company argued that this section did not independently confer authority, but merely prescribed the forms of communication to which the Act's other provisions may separately be made applicable and neither Title II, pertaining to "common carriers," nor Title III, pertaining to broadcasters, would comprehend CATV.

in getting sufficient LPG to dry their crops".

On April 13, 1973, Senator Jackson introduced S. 1570, which was reported out of committee on May 17, 1973, as the Emergency Petroleum Allocation Act of 1973. The committee report accompanying the bill explained that it was "designed to deal with the urgent problem of the first peacetime fuel shortages in American history," that fuel shortages had occurred the previous winter, and that "[i]t is increasingly clear that something more than the limited discretionary authority of the Economic Stabilization Act is required to deal with emergency fuel shortages . . .." The bill was intended to "allow an orderly transition from any plan developed by the Administration under existing discretionary authority".[15] S.Rep.No.93–159, 93d Cong., 1st Sess. (May 15, 1973) 4–6. Thus, in contrast to Mobil's contentions, it is clear that the EPAA from the beginning was intended as a comprehensive scheme for regulation of all fuel *to replace* the limited authority of the Stabilization Act.[16]

The committee report shows that the Senate was particularly concerned about shortages of LPG (propane, butane and propane-butane mixtures), but the report made no distinction between LPG produced from gas plants, representing about 70% of the total, and the LPG which results as a byproduct of refinery operations, representing the remaining 30%. This concern over shortages of LPG and other natural gas liquids was repeated throughout the floor debates on the bill, especially with regard to the impact of shortages upon agricultural and industrial operations. See, *e. g.,* 119 Cong.Rec. 18043–45, 18047–67 (June 5, 1973). Again, nothing in the debates prior to Senate passage on June 5, 1973, suggests that Congress intended the bill to distinguish between shortages of fuels derived from crude oil and fuels extracted from natural gas streams.

In the interim between Senate passage of S.1570 and House consideration of a similar bill, H.R.9681, the President's EPO issued its notice of proposed rulemaking to adopt a "Mandatory Fuel Allocation Program" applicable to all crude oil and petroleum products, including natural gas liquids. 38 Fed. Reg. 21797 (Aug. 13, 1973). The COLC also promulgated Phase IV mandatory price controls for the overall petroleum industry. 38 Fed.Reg. 22536 (Aug. 22, 1973). Thus, the House had the benefit of knowing how the Administration proposed to treat mandatory allocation and price controls when it considered H.R. 9681. Consequently, the House took care to provide the necessary authority and flexibility to implement the types of price and allocation regulations already proposed or promulgated by the Administration which were applicable to all petroleum products, including natural gas liquids. See H.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2589.

The House had also determined that the complexity and size of the petroleum industry made it impossible for Congress to fashion a comprehensive program on its own. Instead, it decided to grant to the President wide administrative flexibility within the broad outlines of legislative policy. The House report stated:

> To freeze in statutory terms an allocation program for this industry would simply not be good policy. Administrative flexibility is a prerequisite and, consequently, the Committee has decided to recommend that the Executive be assigned the responsibility for drafting the program pur-

---

**15.** This refers to the existing authority, pursuant to § 203(a)(3) of the Stabilization Act, to provide for "systematic allocation of supplies of petroleum products".

**16.** Language from the conference report evidences the understanding of Congress that the mandatory programs of the EPAA were to substitute for and supersede the programs of the Stabilization Act. The EPA permitted deferral

of these new allocation programs for products already subject to mandatory allocation. That deferral was "founded on the desire to take every step to permit an orderly transition from those programs to the allocation requirements of this legislation." H.R.Conf.Rep.No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2688, 2697.

suant to Congressionally defined (though generally stated) objectives. H.R.Rep. No.93–531, 93d Cong., 1st Sess. (1973), [1973] U.S.Code Cong. & Admin.News 2582, 2589.

The House, like the Senate, was also concerned about shortages of LPG and other natural gas liquids for agriculture and industry. See, e. g., 119 Cong.Rec. 34455–79 (1973); H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2588, 2595. Again we find no intent to distinguish these products as to their source.

In our opinion the district court properly concluded that the FEA would be incapable of attaining the objectives of the EPAA "to the maximum extent practicable" without authority to regulate natural gas liquids, regardless of their source. For example, as we have already noted, 70% of all propane and butane produced in the United States is extracted from wet natural gas. It makes little sense that Congress would have mandated that the FEA provide for "maintenance of agricultural operations" and "maintenance of residential heating"—both often depending upon supplies of propane— and yet have intended that the FEA regulate only 30% of the total supply. This is especially true since propane and butane from refinery gases and from gas plants are often commingled prior to use and therefore indistinguishable. Similarly, imported propane and butane may derive from either natural gas or from refinery gas, but they are not distinguished when they arrive here so it would be impossible to regulate only that which derives from refinery gas.

Overall, it appears also that the liquid products of natural gas plants represent approximately 15% of the total petroleum production of the United States. Though some natural gas liquids have uses as end products, most natural gas liquids' primary use is as feedstock for refineries and for petrochemicals. Approximately 6 to 7% of all refinery feedstock consists of natural gas liquids, with natural gasoline more than half of the total. Fostering competition within both the refinery and petrochemical industries were express goals of the EPAA, and the conference committee emphasized that feedstocks for petrochemicals in particular were an important end use for which allocation should be made. H.R.Conf.Rep. No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2688, 2693.[17]

Moreover, the operation of many small refineries depends upon supplies of condensate and natural gasoline because they are set up to process only those substances which have a composition that closely resembles the final refinery product, motor gasoline.[18] Congress intended to ensure that such small and often independent refiners were able to obtain petroleum products supplies necessary to continue "to operate at full capacity". See H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S. Code Cong. & Admin.News 2582, 2595.[19] If the FEA could not regulate supplies of natural gasoline and condensate, it would be more difficult for it to preserve "an economically sound and competitive petroleum

---

17. The Conference report stated that it wished "to emphasize that, in expressing congressional concern with fostering competition in the petrochemical industry, the committee intends to also identify petrochemical feedstock needs as important end-uses for which allocation should be made". H.R.Conf.Rep.No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2688, 2693.

18. An affidavit submitted by Mobil states, for example, that some "small independents have designed their refiners to process 100% condensate as their charge stock since they are interested in primarily gasoline marketing".

19. The House report stated that it was "imperative that the Federal government now accept its responsibility to intervene into these [petroleum product] markets to preserve competition". H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin. News 2582, 2586. Congress was particularly concerned about the small and independent refiners. Congress recognized that these "enterprises have an importance to the United States economy far out of proportion to their market shares, because they continually spur the major integrated firms to improve their own efficiency in the production, refining, transportation and marketing of products". Id. at 2595.

industry" and allocate supplies of petroleum products among "all regions and areas of the United States".[20]

Gasoline for internal combustion engines is expressly subject to regulation under the EPAA. Though natural gasoline cannot be used alone as a fuel for internal combustion engines, it is a crucial ingredient as a blending agent in the production of motor gasoline. Natural gasoline contains the lighter, more volatile hydrocarbons which are necessary to provide starting capability and quick warm-up in the final blend of motor gasoline. As such, natural gasoline typically will represent 6 to 10% of the total volume of the blended fuel. Without authority to allocate the supply and control the price of natural gasoline, FEA would not be able to fully regulate motor gasoline to achieve its statutory goals.

Natural gas liquids thus play a crucial, integral role in the production of many products explicitly covered by the EPAA. The FEA has determined that it must treat natural gas liquids and crude oil as a conceptual and economic unit if it is to satisfy its statutory mandate. We note that although Congress' initial concern was with shortages of the end products of the petroleum industry—fuels such as gasoline, propane, and heating oil—during the process of drafting the statute it was determined that regulation of the end products would be unsuccessful without regulation of the raw materials. Therefore Congress expressly added crude oil to the jurisdiction of the EPAA. H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2589.[21] Without jurisdiction over natural gas liquids, the FEA similarly would be less successful in regulating the end products of the petroleum industry. Congress clearly intended to give the FEA "full flexibility in devising the most effective and efficient means of meeting the priority needs of the American people identified in section 4(b) (15 U.S.C. § 752)". H.R.Conf.Rep.93–628, 93d Cong. 1st Sess. (1973); [1973] U.S.Code Cong. & Admin. News 2688, 2689.

We conclude that Mobil's construction of FEA jurisdiction under the Act ignores the broad powers and administrative flexibility implied by the comprehensive purposes of the Act. FEA's determination to regulate natural gas liquid hydrocarbons—which comprise many of the same hydrocarbon molecules found in crude oil and in the products of crude oil refining and which are often feedstocks for the production of refined petroleum products such as gasoline—was a legitimate selection by the agency of the means necessary for the achievement of its statutory mandate.

## NONTECHNICAL USE OF INDUSTRIAL TERMS

It is true, as Mobil contends, that if words of well-known significance in trade or commerce are used in a statute, the commercial meaning should prevail over common usage. See, e. g., *Cadwalader v. Zeh*, 151 U.S. 171, 176, 14 S.Ct. 288, 38 L.Ed. 115 (1894). But, that rule does not apply where Congress has clearly manifested a contrary intention. *Id.* The intention of Congress is the critical, "all important factor". *United States v. Stone & Downer Co.*, 274 U.S. 225, 239, 47 S.Ct. 616, 71 L.Ed. 1013 (1927). *Cf. Corning Glass Works v. Brennan*, 417 U.S. 188, 198–201, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The district court enumerated three instances which it felt demonstrated the incongruity of Congress' intended meaning and the industrial usage of the statutory terms. These were the language of S. 1570, the so-called Dunlop letter, and the 1975 Conservation Act amendments to the EPAA. The court concluded that these incongruities negated Mobil's

---

**20.** The House report emphasized that an "economically sound and competitive petroleum industry" was a "fundamental goal of the Congress". *Id.* at 2596.

**21.** The House report referred to statements by witnesses which indicated the "allocation program simply would not work unless crude oil were included". *Id.* at 2589. The report went on to say that, as a result, the President "would be required to extend the reach of this program to the refiner and producer level". *Id.* at 2590.

contention that Congress intended to adhere to industrial usage. We agree.

Senate Bill 1570 addressed shortages of "crude oil (including natural gas liquids) and refined petroleum products (including liquid petroleum gas)". Because no industrial usage of the term "crude oil" comprehends natural gas liquids, it is clear the Senate, at least, did not adhere to the industrial meaning of the term when it drafted its version of the EPAA.

Mobil contends that because no similar parentheticals were included in the House amendments to the bill, which were eventually adopted, we must infer that coverage of natural gas liquids was meant to be excluded. Mobil points out that in discussing the deletion in the final version of the bill of the Senate's findings regarding shortages of natural gas liquids, the conference report stated that the Senate expressly receded to the House. An unexplained or ambiguous recession, however, should not be given great weight. See *Philbrook v. Glodgett*, 421 U.S. 707, 716, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). It may be that the Senate receded to the deletion of findings respecting natural gas liquids because it believed that the broadly inclusive term "natural gas liquids" should not be used, since ethane, one of the natural gas liquids, was expressly exempt from regulation under the Act and the other natural gas liquids had been covered under the term "refined petroleum products".

The Dunlop letter is a letter written by the chairman of the COLC, Dr. John Dunlop, which Senator Jackson read into the Congressional Record to show congressional understanding of the terms used. The letter expressed Dr. Dunlop's interpretation of the stripper well exemption contained in the Act. The letter stated that the term "crude oil", as used in the stripper well exemption, was "intended to encompass all crude petroleum produced at the wellhead, including both crude oil and crude oil condensates, including natural gas liquids, . . such as propane, butane, and ethane". Presuming, as its chairman, to speak for the conference committee for the EPAA, Sena-

tor Jackson stated that this interpretation conformed to the intent of the conference committee. 119 Cong.Rec. 37085, 37087 (1973). Thus, with respect to the term "crude oil", it appears that the full Congress may well have viewed it as encompassing natural gas liquids, at least for some purposes, contrary to accepted industrial usage.

■ The final and most compelling indication that Congress understood the terms used in the statute to mean more than their technical, industrial definitions is the language of section 12 of the EPAA, 15 U.S.C. § 760a, which was added to the Act by the Energy Policy and Conservation Act of 1975 (Pub.L. No. 94–163, 89 Stat. 871). Section 12 provides a mechanism for decontrol of certain enumerated substances, including any "refined petroleum product or refined product category". Subsection (c)(3) reads in pertinent part:

(c)(3) As used in this section the term "refined product category" means—

.     .     .     .     .

(D) All or any portion of other refined petroleum products as a class (*including natural gas liquids and natural gas liquid products*, other than propane). (Emphasis added).

Congress provided for decontrol of natural gas liquids because it believed that it had controlled them under the terms of the EPAA. This subsequent legislation effectively demonstrates the understanding of Congress at the time it enacted the EPAA and is entitled to great weight since there are otherwise ambiguities on the face of the Act. See *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Erlenbaugh v. United States*, 409 U.S. 239, 243–44, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).

Mobil attempts to rationalize the language of section 12, and its position regarding the plain meaning of the terms used, by arguing that Congress was merely referring in section 12 to those natural gas liquids it had expressly provided for originally, the gas by-products of crude oil refining.

While this makes some linguistic sense, closer examination reveals the flaw in that argument. Section 12 permits decontrol of natural gas liquids "other than propane". But, according to Mobil, only propane and butane refinery gases were regulated originally, so decontrol would therefore only apply to butane. We doubt that Congress would use the terms "natural gas liquids and natural gas liquid products" to mean only butane refinery gas.

Based upon these incongruities, we reject Mobil's argument that because technical terms were employed in the statute we should attribute to Congress the intent to use those terms in their technical sense. We are convinced that Congress contemplated substantially greater coverage for the EPAA than would result from strict adherence to the technical meanings of the terms "crude oil, residual fuel oil, and refined petroleum products".[22] The addition of section 12 to the EPAA is the clearest indication of the broader intentions of Congress, but there are other circumstances which buttress our convictions.

### CONTINUATION OF PRE–EPAA REGULATIONS UNDER THE EPAA

We have noted that under the Stabilization Act, the COLC had promulgated price regulations which applied to natural gas liquids as "covered products" and gas plant processors as "refiners". 6 C.F.R. 150.352. Congress in passing the Allocation Act unquestionably intended to rely on the COLC price regulations then extant. Section 6(a) of the EPAA directed that the COLC regulations then in effect "shall continue in effect until modified pursuant to this Act". 15 U.S.C. § 755(a). Thus we recognized in both *Consumer's Union*, 525 F.2d at 1078,

and in *Marathon*, 547 F.2d at 1145 n.13, that Congress contemplated that those regulations would be carried forward under the EPAA. See H.R.Conf.Rep.No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2688, 2702. We infer from this that Congress considered the jurisdiction of the EPAA to be in many respects coterminous with Stabilization Act jurisdiction over petroleum products. The EPAA, however, was a mandatory authority to replace the Stabilization Act and cure the deficiencies the Government had encountered in enforcing compliance with its voluntary allocation program. See H.R.Rep. No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2587–89.

We conclude also that Congress in instituting a mandatory allocation program intended the President to rely upon the EPO's proposed "Mandatory Fuel Allocation Program". The EPO published this program on August 13, 1973. 38 Fed.Reg. 21797 (Aug. 13, 1973). It expressly comprehended allocation of liquified petroleum gas and the regulation of gas plant operators as "suppliers". *Id.* at 21800. The House report on the EPAA recognized that the statutory deadlines for promulgation of mandatory allocation regulations normally "would be an extraordinarily short time for so complex a task". H.R.Rep.No.92–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2589. But, the report continued:

> Most of the work, however, has already been accomplished. The Administration has had several months experience under the voluntary program. Drafting of a mandatory program has been in progress for over two months. Moreover, *in Au-*

---

**22.** In this regard we point out that Congress acknowledged that it intended to impute greater significance to the terms it employed than simply ordinary industrial usage. The conference report stated:

> The conference committee considers the term "kerosene" to also encompass jet fuel and the term "diesel fuel" to also refer to light commercial heating oil. It is understood that the term "distillates" when applied in a technical sense would encompass only Numbers

1, 2, and 4 fuel oils. It is the committee's intent, however, that this term also reach to include naphtha and benzene so as to require the allocation of these products as may be necessary to accomplish the objective of restoring and fostering competition in the petrochemical sector of industry.

H.R.Conf.Rep.No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2688, 2693.

*gust the President published for comment a proposed mandatory allocation program of similar scope to that called for in this bill.* (Emphasis added). *Id.*

In *Marathon,* we also considered Congress' intent with respect to prior administrative regulations and proposed regulations. We found "no room for doubt that Congress knew of these regulations and proposals when it considered passage of the Act". 547 F.2d at 1145. We concluded that Congress intended the new fuel allocation program to be patterned after the previously proposed program. *Id.*

The district court considered the legislative history of the EPAA and found that "Congress intended for the executive branch to combine both price and allocation regulations for the petroleum industry in one administrative program". (Citing H.R. Conf.Rep.No.93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin. News 2688, 2702). The COLC price regulations were to be carried over and the EPO allocation regulations were to serve as a model for EPAA regulations. We agree with this assessment of the intent of Congress with respect to these prior programs and find no reason to believe that Congress did not also intend the scope of the EPAA regulatory scheme to be essentially coterminous with those programs.[23]

## CONGRESSIONAL RATIFICATION

We find further evidence of legislative intent in subsequent Congressional actions. In 1975, FEA officials gave extensive testimony to Senate and House oversight committees regarding FEA regulation of natural gas liquids pursuant to FEA interpretation of its authority under the EPAA. These officials read statements to both committees which described, *inter alia,* how 70% of all domestic propane derives from natural gas liquids, how the FEA had found that regulation of gas processors under its

refiner rules did not work well, and how the FEA had promulgated new special rules for gas processors as a result. See Hearings Before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, Ser. No. 94–17, 94th Cong., 1st Sess. (1975) 455–57 (Statements of Robert E. Montgomery, Jr. and Gorman Smith); Hearings Before Senate Comm. on Interior and Insular Affairs, Ser. No. 94–16, 94th Cong., 1st Sess. (1975) 509–14 (Statement of Frank Zarb). Subsequent to this presentation, Congress extended or modified the EPAA three times without suggesting that the FEA lacked the authority it was obviously exercising. Pub.L. No. 94–99, 89 Stat. 481 (Sept. 29, 1975); Pub.L. No. 94–133, 89 Stat. 694 (Nov. 14, 1975); Pub.L. No. 94–163, 89 Stat. 871 (Dec. 22, 1975) (The Energy Policy and Conservation Act).

Mobil argues that these actions of Congress do not imply ratification of agency action because Congress did not know there was any challenge to FEA's assertion of authority. Mere re-enactment does not signify adoption of an administrative interpretation, unless it can be shown that Congress was conscious it was doing so. *Pacific Power & Light Co. v. FPC,* 184 F.2d 272, 275 (D.C. Cir. 1950).

While congressional ratification would doubtless be clearer if it were shown that Congress knew that FEA regulations were being challenged when it re-enacted the EPAA, that is not the only circumstance which may lead to a finding that Congress had implicitly ratified agency interpretation of its statutory mandate. Ratification may be inferred from "a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it . . . ." *Kay v. FCC,* 143 U.S.App.D.C. 223, 231–232, 443 F.2d 638, 646–47 (1970). The Supreme Court recently summarized the rules of statutory construction apropos of re-enactment and ratification as follows:

---

**23.** EPO's mandatory allocation program imposed the same regulations upon both refined petroleum products and liquified petroleum gasses without distinction as to their source.

[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress. We have also recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) (footnotes omitted).

While FEA's interpretation of the EPAA may not be "longstanding" in point of time, the extent of Congressional consideration of the energy problem and its enactment of energy legislation support a finding of Congressional intent. Since 1973 each session of Congress has produced new energy legislation which entailed scrutiny of existing programs through Congressional hearings. The FEA has consistently maintained jurisdiction over natural gas liquids, and Congress has re-enacted the EPAA without overruling the FEA's position. The Energy Policy and Conservation Act of 1975 made several major changes in the Act. We believe that Congress' cognizance of FEA's actions and its concern with energy and energy related problems would have led to a clear rejection of FEA's assertion of jurisdiction over natural gas liquids if Congress did not view that assertion as properly within the scope of FEA's authority.

## CONDENSATE

Finally, Mobil contends that even if the district court were correct in its conclusion with respect to the natural gas liquids recovered in gas processing plants (such as butane, propane, and natural gasoline), the FEA still would not have jurisdiction over

condensate. Mobil argues that condensate is distinguishable in that (a) it is "a *raw* substance which is not ready for any ultimate consumption in its raw form as separated from the natural gas produced from gas wells"; (b) it is not either "crude oil" or a "refined petroleum product"; and (c) it is not mentioned in the EPAA. Mobil apparently does not question the district court's finding that condensate is the "functional equivalent" of light crude oil, but contends that the fact that "condensate may be applied by the industry to the same uses as light crude oil does not mean that condensate *is* crude oil".

While Mobil's argument is not without merit, we believe that there are substantial counter-balancing reasons to uphold FEA jurisdiction over condensate as well as the other natural gas liquids. In the first place, there is a similarity in the chemical composition of the products. Condensate comprises a mixture of hydrocarbon molecules which resembles in some respect natural gasoline (though generally heavier overall) and the lighter fraction of hydrocarbons found in crude oil. The individual hydrocarbons which constitute condensate, natural gasoline and light crude oil are identical in each mixture, although they appear in different proportions. In essence the distinction urged by Mobil between products explicitly covered by the Act and condensate rests upon the source and manner of production rather than the composition or utilization of their hydrocarbon components.

We recognize that gas well reservoirs under great pressure and temperature containing heavier hydrocarbons in the gaseous phase present difficult and complex extraction problems for the industry to maximize the yield of hydrocarbons from within the earth.[24] We recognize also that these problems justify the industry's special treatment of the term condensate. We do not believe,

---

24. Petroleum engineers must carefully plan for and regulate the pressure in the reservoir during recovery procedures to insure that retrograde condensation does not occur before the substances are extracted. If that does occur it may mean that valuable hydrocarbon resources will be lost in the reservoir.

however, that Congress was concerned with the source of any particular hydrocarbon mixture when it created its comprehensive regulatory scheme to control the prices and supplies of vital hydrocarbon fuels. While the petroleum industry may distinguish between crude oil and condensate, it does not deny that condensate is commingled with light crude oil and used like light crude oil as a petrochemical and refinery raw material, providing a mixture of hydrocarbon molecules for the production of vital fuels and other refined products. We conclude that many of the same reasons for upholding FEA's assertion of jurisdiction over gas processing plant products—as a necessary and proper means of achieving its statutory objectives—apply with equal force to uphold FEA jurisdiction over condensate.

The Dunlop letter, for example, demonstrates that at least with regard to the stripper well exemption, Congress intended crude oil to include condensate separated from the natural gas associated with oil wells. Moreover, Congress, by re-enacting the EPAA in late 1975 and ratifying FEA regulation of gas plant operators and their products, could be deemed to have effectively ratified the FEA price regulations which interpreted "crude oil" to include both lease and plant condensate,[25] 10 C.F.R. § 212.312, and FEA allocation regulations which included lease but not plant condensate. 10 C.F.R. § 211.51.

Another indication of Congress' failure to distinguish between condensate and crude oil for the purposes of FEA authority is found in Appendix A to the House report. Appendix A is a report from the Department of Interior on the heating oil situation for the coming winter. H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News 2582, 2602. The report discusses the inadequate domestic supply of distillate fuel oil. It attributes part

of that deficiency to the unavailability of domestic crude oil and states that the United States is increasingly dependent upon foreign crude oil because domestic production of crude *and* condensate peaked in 1970 and has declined since. *Id.* at 2606.

It is true that this report has less weight than a report prepared by Congress itself. Nonetheless it is a part of the legislative history of the EPAA and doubtless served as a stimulus for Congressional concern and action.[26] It is not illogical to assume that because the problem of crude oil availability was expressed to Congress in terms of a decline in domestic production of crude *and* condensate, Congress intended no distinction between the two in its attempted remedy.

We conclude that the FEA, by its regulation of condensate as "crude oil" under the EPAA, did not violate the intent of Congress, and that its regulations should be upheld.

### CONCLUSION

We agree with the district court that the statute is, in some respects, inartfully drawn. We agree also with the court's conclusion that the statute's objectives, goals, and purposes are clear. The FEA had the obligation to achieve the comprehensive objectives of the Act to the "maximum extent practicable".

From our review of the legislative history of the Act itself, regulations in effect when the Act was adopted, and subsequent legislative actions, we conclude that Congress did not intend to adhere to the technical meanings of industrial usage and did not distinguish between chemically similar hydrocarbons or hydrocarbon mixtures on the basis of their source or manner of production. We find nothing in the EPAA which would prevent the FEA from asserting reg-

---

**25.** See note 3 *supra*.

**26.** The House report referred to this Department of Interior report when discussing the

critical crude oil shortages which, in part, motivated passage of the Act, H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code & Admin.News 2582, 2584.

ulatory jurisdiction over all natural gas liquids, including condensate. To the contrary, there are strong indications from Congressional actions both before and after passage of the EPAA that Congress contemplated that these substances would fall within the ambit of agency authority. "We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted." *Permian Basin Area Rate Cases*, 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968). We affirm the holding of the district court.