**AEROPRES CORPORATION and Diversified Chemicals & Propellants Company**

v.

**DEPARTMENT OF ENERGY.**

Civ. A. No. 780476.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Dec. 19, 1978.

Robert U. Goodman, Robert J. Donovan, Jr., Naff, Kennedy, Goodman, Stephens, Donovan & Parnell, Shreveport, La., Mac S. Dunaway, Stuart S. Dye, George D. Billock, Jr., Jeffrey D. Knowles, Dunaway, McCarthy & Dye, P. C., Washington, D. C., for Aeropres.

Sidney E. Cook, John F. Cassibry, Cook, Clark, Egan, Yancey & King, Shreveport, La., Irving H. Goldberg, Laura A. Kaster, Steven B. Berlin, Jenner & Block, Chicago, Ill., for Diversified Chemicals.

Barbara Allen Babcock, Asst. Atty. Gen., Civil Rights Div., U. S. Dept. of Justice, C. Max Vassanelli, Joan M. Wilbon, Attys., U. S. Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., Frances O. Allen, Asst. U. S. Atty., W. D. La., Shreveport, La., for Dept. of Energy; Janet L. Steckel, Dept. of Energy, Washington, D. C., of counsel.

DAWKINS, Senior District Judge.

### RULING ON MOTIONS

This matter comes before us on motions for preliminary injunction by plaintiff, Aeropres Corporation, and by intervenor, Diversified Chemicals and Propellants Company. Aeropres is a manufacturer of hydrocarbon aerosol propellants (HAPS), a product used primarily as a propellant in various aerosol cans. Diversified is a distributor and marketer of such propellants. Both parties seek to prevent defendant, the Department of Energy, from taking any action to regulate the price of HAPS through its price regulations, 10 CFR Parts 210, 212. The question here is whether movants are entitled to some form of temporary relief pending disposition of the matter at trial. For the reasons here set forth, it is our carefully considered opinion that movants are entitled to such relief and that therefore their motions should be granted.

### INTRODUCTION AND BACKGROUND:

Aeropres is a Louisiana corporation engaged in the manufacture of hydrocarbon aerosol propellants. Its manufacturing process involves purification of commercial butane, propane, and isobutane, through various chemical and physical treatments, and blending of these substances into a commercial product used primarily as a propellant in aerosol spray cans. Aeropres began operations as a Louisiana corporation in May of 1973. Diversified is an Illinois corporation which has distributed and marketed HAPS since December, 1965. The Department of Energy (DOE) was created by the Department of Energy Organization Act, P.L. No. 95–91, 91 Stat. 565, 42 U.S.C. § 7101, et seq., effective October 1, 1977.

Until February 20, 1976, movants conducted business under the assumption that hydrocarbon aerosol propellants were not subject to price or allocation regulation by DOE or its predecessors. Aeropres had special cause for its assumption, since it had written and called predecessors of DOE, seeking clarification, as early as September, 1973. Aeropres was unable to obtain clarification.

On February 20, 1976, the Regional Counsel of the Federal Energy Administration for Region V, Chicago, Illinois, issued Interpretation # 1976–24 to Diversified. This Interpretation concluded that hydrocarbon aerosol propellants were within the regula-

tory authority of the FEA and were subject to its price and allocation regulations. This interpretation was appealed to the Office of Exceptions and Appeals, and Aeropres accepted an invitation to participate. On March 20, 1978, after a hearing, DOE's Office of Administrative Review (the successor to the FEA Office of Exceptions and Appeals) affirmed the interpretation of the Regional Council in Decision and Order FIO–1370.

Aeropres filed its petition for declaratory and injunctive relief and judicial review on April 19, 1978. Diversified intervened on May 2, 1978, praying for similar relief. As we have noted, both since have filed motions for a preliminary injunction, which now are properly before us for decision.

STATUTORY AND REGULATORY FRAMEWORK:

The authority to regulate prices initially was given to the President by the Economic Stabilization Act of 1970.[1] The President, pursuant to ESA, established the Cost of Living Council and delegated to that body his authority under the Act.[2]

In 1973, after several intervening amendments and Executive Orders not applicable here, the ESA was amended to give the President the power to *allocate* "petroleum products including crude oil."[3]

Later in 1973, the Emergency Petroleum Allocation Act was passed,[4] giving to the President the power to allocate and set prices for "crude oil, residual fuel oil, and each refined petroleum product."[5] Pursuant to these Acts, the President established

the Federal Energy Office and transferred to it allocation powers under the ESA and all the powers under the EPAA.[6] In the same order, the President ordered the Chairman of the Cost of Living Council to delegate to the Administrator of FEO "such authority under the ESA as may be necessary to carry out the purposes of that Act with respect to energy matters."[7]

The CLC Chairman complied with this order in CLC Order # 47, 2 Jan. 74, 39 FR 24, by delegating to the FEO Administrator the Chairman's authority under the ESA to regulate prices with respect to petroleum products and crude oil. "Petroleum products and crude oil" are defined (as amended by CLC Order # 47, Amendment 1, 39 FR 4129; 1 Jan. 78,) as

"products described in the 1972 edition Standard Industrial Classification Manual under Industry Codes 1311 (except natural gas), 132 [*sic*—should be 1321] (excluding ethane), or 2911 (including benzene and toluene but excluding ortho-xylene, meta-xylene, para-xylene and butadienes) and all forms of benzene and toluene."

In 1974, the Federal Energy Administration Act of 1974 was passed,[8] giving the Administrator thereof (A) authority to regulate the "production, conservation, use, control, distribution, rationing, and allocation of all forms of energy as are appropriate in connection with only those authorities or functions . . . delegated to him by the President . . . [and] vested in the Administrator by the Congress,"[9]

1. Title II, P.L. 91–379, 84 Stat. 799, 12 U.S.C. § 1904 note (1970).

2. Executive Order No. 11615, August 17, 1971, 36 FR 15727.

3. P.L. 93–28, 87 Stat. 27, 12 U.S.C. § 1904 note (1973).

4. P.L. 93–159, 87 Stat. 627, 15 U.S.C. § 751, *et seq.* (1973).

5. P.L. 93–159 § 4(a), 15 U.S.C. § 753(a).

6. Executive Order No. 11748, December 6, 1973, 38 Fed.Reg. 33575.

7. *Id.*

8. P.L. 93–275, 88 Stat. 96, 15 U.S.C. § 761, *et seq.* (1974).

9. P.L. 93–275, § 5(a), 15 U.S.C. § 764(a). Section 764(a), in full, provides:
    § 764. Specific functions and purposes
    (a) Subject to the provisions and procedures set forth in this chapter, the Administrator shall be responsible for such actions as are taken to assure that adequate provision is made to meet the energy needs of the Nation. To that end, he shall make such plans and direct and conduct such programs related to the production, conservation, use, control, dis-

and (B) all functions of the Cost of Living Council which related to or were utilized by the Energy Division of the CLC.[10]

The President, by E.O. # 11790, (June 25, 1974, 39 FR 23185), then delegated to the FEA (1) all authority under the EPAA of 1973 (Allocation and Pricing authority, *inter alia*), (2) authority under the ESA of 1970, as amended, section 203(a)(3) (Allocation authority), and (3) all authority transferred to the FEO by the CLC in CLC Order # 47 (Pricing authority). Regulations were enacted by the FEA, implementing this authority. 10 CFR Parts 210–212.

Finally, as noted, in 1977, the DOE Organization Act established DOE.[11] 42 U.S.C. § 7151(a) transfers to the Secretary of DOE all powers vested in the Administrator of the FEA.[12] Executive Order # 12038 (Feb. 3, 1978, 43 FR 4957) implements this delegation by amending E.O. 11790 to substitute "Secretary" for "Administrator" and "DOE" for "FEA," thereby transferring FEA powers to DOE.

From the foregoing history, it is evident that the source of DOE's alleged authority to regulate prices for HAPS must either be the EPAA of 1973 ("crude oil, residual fuel oil, and each refined petroleum product") or CLC Order # 47, as amended ("petroleum products, including crude oil," as defined by the SICM). If HAPS do not fall within the ambit of these sources of authority, then the DOE cannot purport to regulate the prices of HAPS.

## REQUIREMENTS FOR INJUNCTIVE RELIEF

There are four prerequisites for the issuance of a preliminary injunction:

(1) A substantial likelihood that plaintiff will prevail on the merits;

(2) A substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) That the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and

(4) That granting the preliminary injunction will not disserve the public interest.

*Fredericks v. Kreps,* 571 F.2d 1316 (5th Cir. 1978); *Morgan v. Fletcher,* 518 F.2d 236 (5th Cir. 1975).

1. *Likelihood of Success on The Merits*

*Factual Basis for Claim of Lack of Authority*

Aeropres and Diversified contend that commercial-grade propane, butane, and isobutane are used as feedstocks in the HAP manufacturing process. The resultant

---

tribution, rationing, and allocation of *all forms of energy* as are appropriate in connection *with only those authorities or functions—*

    (1) specifically transferred to or vested in him by or pursuant to this chapter;

    (2) delegated to him by the President pursuant to specific authority vested in the President by law; and

    (3) otherwise specifically vested in the Administrator by the Congress. [Emphasis supplied.]

**10.** P.L. 93–275, § 6(b), 15 U.S.C. § 765(b). There is some question regarding the efficacy of § 6(b). The House Report states,

    "Subsection (b) transfers the function of the Energy Division of the CLC, which was established by E.O. 11615 of Aug. 15, 1971. This Division exercises the authority of the Council, in connection with energy matters, pursuant to the Economic Stabilization Act of 1970, as amended." H.Rep.No.93–748, 1974 U.S.Code Cong. & Admin.News, p. 2939 at 2958.

However, as demonstrated by the minority views of Hon. John E. Moss and Hon. Bella S. Abzug, Section 6(b) may be unnecessary:

    "Section 6(b) of the bill purports to transfer to the FEA functions vested in the Cost of Living Council and utilized by the 'Energy Division of the Cost of Living Council.' The President's Executive Order 11748 of December 4 specifically provided for delegating such functions of the Council to the Federal Energy Office established by that Order. If this delegation has taken place, section 6(b) may be inadequate to accomplish its purported aim. . . ." H.R.No.93,748, 1974 U.S. Code Cong. & Admin.News, p. 2939 at 2970. As we view it, the CLC energy powers were transferred to the FEO by CLC Order # 47. Thus we treat § 6(b) as surplusage and it will not play a part in our further discussion.

**11.** P.L. 95–91, 91 Stat. 565, 42 U.S.C. § 7101, *et seq.* (1977).

**12.** P.L. 95–91, § 301(a).

HAPS, they claim, because of the special manufacturing process, the high degree of purity, and the special applications, should be classified as industrial organic chemicals (as opposed to refined petroleum products). HAPS, it is said, are stored, handled, and transported as a chemical in specially dedicated equipment, distinct from that used to transport, handle, and store commercial feedstocks.

The manufacturing process, according to Aeropres, involves initial analyzation of the composition of the commercial feedstocks and subsequent chemical and physical reactions to purify those feedstocks. Purification involves removal of sulfur, moisture, oils, and certain other hydrocarbons. Movants thus contend that the product differs from the feedstock in kind, composition, physical and chemical properties, and practical uses; and Aeropres has attached a chart showing the different properties of the substances in question.

We take note that HAPS are not specifically classified under Industry Codes 1311, 1321, or 2911 in the 1972 Standard Industrial Classification Manual. On the other hand, neither were HAPS classified by name in any other Code section.

*Authority under Cost of Living Council Order # 47*

As we have discussed, one possible source of regulatory authority over HAPS is Cost of Living Council (CLC) Order # 47, January 2, 1974, 39 FR 24; as amended January 30, 1974, 39 FR 4129. The objective of this order, pursuant to Executive Order No. 11748, was to delegate to the Federal Energy Office such price stabilization authority as was "necessary to carry out the purposes of [the Emergency Petroleum Allocation Act] with respect to energy matters."[13]

The Order provided, in part:

1. Except as provided in paragraphs 2, 3, 4 and 5 of this order, there is hereby delegated to the Administrator of the Federal Energy Office authority to make determinations and take actions required or permitted by the Economic Stabilization Act of 1970, as amended, with respect to petroleum products and crude oil. . . .

   For the purposes of this order petroleum products and crude oil means products described in the 1972 edition Standard Industrial Classification Manual, under Industry Codes 1311 (except natural gas), 1321, or 2911.[14]

   \*     \*     \*     \*     \*     \*

4. The authority delegated in paragraph 1 of this order does not include any authority, duty or responsibility with respect to the petrochemical industry.[15]

Since HAPS are not listed in any of the mentioned Industrial Codes, it appears to us that there is a substantial likelihood that the DOE has no authority under CLC Order # 47 to regulate the prices of HAPS.

For the record, we note that Industry Code 1321 (Natural Gas Liquids) does include butane, isobutane, and propane, but that Code section is directed primarily toward those establishments which produce or recover these substances, not those establishments which use these substances as feedstocks.

*Authority under The EPAA of 1973*

Section 4(a) of the EPAA, 15 U.S.C. § 753(a), provides, in part,

   . . . the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in

---

**13.** CLC Order # 47, January 2, 1974, 39 FR 24.

**14.** *Id.* The second part of this paragraph was amended to read,

   For the purposes of this order petroleum products and crude oil mean products described in the 1972 edition, Standard Industrial Classification Manual, under Industrial Codes 1311 (excluding natural gas), 132 [*sic*] (excluding ethane), or 2911 (including benzene and toluene but excluding ortho-xylene and meta-xylene, para-xylene and butadienes) and all forms of benzene and toluene. 39 F.R. 4129, January 30, 1974.

**15.** *Id.*

amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation.

Section 3(5), 15 U.S.C. § 752(5), defines "refined petroleum products" as "gasoline, kerosene, distillates . . . , LPG, refined lubricating oils, or diesel fuel," and Section 3(6), 15 U.S.C. § 752(6) defines "LPG" as "propane and butane, but not ethane."

These sections are the only statutory guide to the authority under the EPAA now possessed by DOE. HAPS are not mentioned in the statute or legislative history, nor have they ever been included (or excluded) in any regulation promulgated (and finally adopted) by the FEA or DOE.[16]

■ In the absence of specific guidelines, we must look to the objectives and purposes of the EPAA to determine whether HAPS fall within the scope of DOE's authority. *Mobil Oil Corp. v. FEA,* 566 F.2d 87 (TECA 1977). Quoting the district court, the court in *Mobil* stated that "the Act was a 'response to the shortage of heating oil in the winter of 1972–73; the shortage of gasoline during the summer of 1973; the resulting pressure on independent service stations whose supplies were being cut off by major oil companies; and . . . the problems of farmers in getting sufficient LPG to dry their crops.' "[17] The *Mobil* court concluded that "EPAA from the beginning was intended as a comprehensive scheme for regulation of all fuel . . ."[18]

In the stated findings, purposes, and objectives of EPAA,[19] Congress manifested an intent to regulate the supply of crude oil, residual fuel oil, and refined petroleum products so that all parts of the country would have an adequate amount to continue vital activities. Its legislative focus was on the hardships suffered by the public and by certain segments of the economy because of fuel shortages. In other words, the focus was on distribution of available supplies rather than on the ultimate usage of those supplies once distributed.

Plaintiffs have shown, to our mind, that there is a substantial likelihood that they will succeed on this issue. At this juncture, it appears to us that the purposes of EPAA would not be served by price regulation of HAPS. In fact, there is a substantial likelihood that one of the purposes of the Act, that of promoting competition in the petroleum industry,[20] may be disserved by such regulation.[21]

■ While potential use as fuel is not the only criterion, it is certainly a factor to be considered in determining whether a particular substance is subject to regulation.[22] Plaintiffs have shown that the hydrocarbon content of HAPS is not used as a source for fuel and that it is not intended to be used as such. One of the prime purposes of development of the HAPS industry was to eliminate the discharge into the atmosphere of fluorocarbons which might damage the ozone layer. HAPS were developed as an alternative to fluorocarbons, which have subsequently been banned by the FTC.

**2. *Substantial Threat of Irreparable Injury***

Aeropres has attached to its motion an affidavit of Ben W. Collins, President of

---

**16.** There is currently under consideration a proposed regulation which would exclude HAPS from DOE's allocation regulations, 43 F.R. 36264 (August 16, 1978). Movants contend that the proposed regulation is indicative of DOE recognition that HAPS are not subject to DOE authority. There are, however, many possible reasons for excluding HAPS from regulation, and, in any case, this proposed regulation is not a final agency action. We therefore cannot rely on this proposed regulation as a basis for our decision.

**17.** 566 F.2d 87, 94–95, (TECA 1977).

**18.** *Id.,* at 95.

**19.** P.L. 93–159, §§ 2, 4(b)(1), 15 U.S.C. §§ 751, 753(b)(1).

**20.** P.L. 93–159, § 4(b)(1)(D), 15 U.S.C. § 753(b)(1)(D).

**21.** As will be more fully discussed *infra,* both plaintiffs allege that they will be put out of business if they are required to comply with the price regulations.

**22.** See, *e. g.* DOE Decision and Order # _____, (Case No. FRA–1456, August 23, 1978) (ARCO).

Aeropres and a member of its Board of Directors; he states,

9. Aeropres has never considered the hydrocarbon aerosol propellants it manufactures to be covered by the regulations of DOE. Based in part on that belief, Aeropres has invested over $3,000,000 of earnings and capital since May of 1973 to expand its facilities, plant, laboratory, transportation and delivery fleet to meet the anticipated volumes and services required by the aerosol industry. It has committed time and personnel to assist not only other government agencies but trade associations and insurance and safety groups to enhance the utilization of hydrocarbon aerosol propellants. Such commitments would have been neither feasible nor practical if the selling price of hydrocarbon aerosol propellants had been regulated.

10. Compliance with DOE's price regulations will require Aeropres to reduce its current selling price to a level that corresponds to the "maximum lawful selling price" on May 15, 1973, plus allowable product cost increases since that date. The overwhelming majority of non-product costs incurred by Aeropres in expanding its facilities, improving the quality of its products over the years, and increased wages and benefits to its employees, cannot be passed through to increase the selling price. Moreover, in May, 1973, Aeropres was operating at a loss and its selling price did not provide profit margin.

11. It is estimated that five to seven hundred man hours will be required to accurately calculate Aeropres' maximum lawful selling prices, and to complete countless forms, reports and attendant computations for a period in excess of five years which are required by DOE's regulations. External assistance from accountants and attorneys will add to the cost of that undertaking which will exceed $100,000.

12. On the basis of our preliminary review, retrospective compliance with DOE's pricing rules from May 15, 1973, will require Aeropres to refund approximately $10,000,000, including interest. This represents more than three times the current

stockholders equity and almost twice the value of the undepreciated assets of Aeropres. The corporation's present earnings, as an unregulated manufacturer, do not produce sufficient cash to pay the interest on $10,000,000, let alone retire the principal. In short, Aeropres would discontinue doing business, leaving the hydrocarbon aerosol propellant manufacturing industry to the major oil companies who are Aeropres' only competitors at present.

13. The foregoing circumstances have created an atmosphere which renders management incapable of making orderly and responsible business decisions and recommendations to the Board of Directors. Immediate compliance with Defendant's pricing regulations exposes Aeropres to significant civil penalties of up to $10,000 per violation and each day the violation continues shall be deemed to constitute a separate violation. The failure to complete the required forms for the last five years is itself a violation which alone could involve penalties in excess of $20,000,000. Moreover, a willful violation of an order could result in criminal penalties for Aeropres up to $20,000 per violation and would be cumulative to any civil penalties. The magnitude of these penalties coupled with the fear of criminal prosecution for willful violation of an order and the alternative of irreparable and potentially fatal injury to Aeropres if compliance is achieved, would tie the hands of any executive in the orderly exercise of his responsibilities.

14. Defendant's order confronts Aeropres with another serious threat in the form of private suits to recover overcharges and treble damages as well as attorneys' fees and costs which is [sic] authorized by the Economic Stabilization Act. Aeropres' exposure to private civil damage actions by its customers is beyond doubt and the burden of defense would be prohibitive.

15. The vast sums of money involved in possible refunds of overcharges, interest, penalties and civil litigation will surely create doubt in the minds of this corporation's customers as to its ability to meet its commitments to supply the ever-increasing de-

mand for hydrocarbon aerosol propellants. Competition in the aerosol industry is such that those customers who turned to Aeropres because of its capabilities, its leadership in the industry, its work with the Environmental Protection Agency, and its tradition of fulfilling its obligations, may now turn away. Aeropres's business reputation is clearly at stake as a result of DOE's order and will be until the issues in the case are resolved.

In a nutshell, if Aeropres is forced to comply with the price regulations at this time, there is a substantial threat that the company will be forced to close its doors. Were this to occur, it would undoubtedly constitute irreparable injury.

The same holds true for Diversified. George C. Deitrich, President of Diversified and Chairman of its Board of Directors, states in his affidavit,

8. Diversified has always believed that the hydrocarbon aerosol propellants it sells are not covered by the regulations of the Department of Energy ("DOE") or its predecessors. Diversified has therefore continued to expand and has invested over $1,000,000 of earnings and capital since May of 1973 for facilities, plants, transportation and delivery fleet to meet the anticipated volumes and services required by the aerosol industry. Diversified has committed the time and marketing skills to help trade associations and insurance and safety groups to encourage the use of hydrocarbon aerosol propellants.

9. Compliance with DOE's price regulations will require Diversified to reduce its current selling price to the "maximum lawful selling price" on May 15, 1973, plus allowable product cost increases since that date. The overwhelming majority of non-product costs incurred by Diversified in expanding its facilities, improving the quality of its products over the years, and increasing wages and benefits to its employees, cannot be passed through to increase the selling price.

10. To accurately calculate Diversified's maximum lawful selling prices, and to complete countless forms, reports and attendant computations for a period in excess of five years which are required by DOE's regulations, an estimated five to eight hundred man hours would be necessary. Assistance from accountants and attorneys will require an expenditure in excess of $70,000.

11. On the basis of our preliminary review, retrospective compliance with DOE's pricing rules from May 15, 1973, will require Diversified to refund over $2,000,000 not including interest. This represents almost three times the current stockholders equity. The corporation's present earnings, as an unregulated manufacturer, do not produce sufficient cash to pay the interest on $2,000,000 let alone retire the principal. If Diversified were required to refund this amount, it would be forced to bankruptcy, discontinuing business, and leaving the hydrocarbon aerosol propellant manufacturing industry to a major oil company, Diversified's only major competitor beside Aeropres, at present.

12. The circumstances outlined above have substantially impaired the managerial abilities of the Board of Directors. Immediate compliance with Defendant's price regulations would irreparably injure Diversified. Failure to comply with its regulations exposes Diversified [to] significant civil penalties of up to $10,000 per violation and each day the violation continues may be deemed to constitute a separate violation. The failure to complete the required forms for the last five years is itself a basis for a charged violation which could involve penalties and a willful violation of an order could result in criminal penalties for Diversified. These penalties together with the legitimate fear of criminal prosecution are the only alternative to a crippling financial burden to Diversified if it must comply.

13. The DOE order against Diversified creates a threat of private suits for overcharges and treble damages as well as attorneys' fees and costs which are authorized by the Economic Stabilization Act. Diversified faces the prohibitive defense costs which may be required by private civil damage actions by its customers.

14. Possible refunds would amount to a huge dollar figure. The liability for these sums in addition to interest, penalties, and civil litigation will impair Diversified's credit by apparently reducing its ability to meet its commitments to supply the ever-increasing demand for hydrocarbon aerosol propellants. Competition might well cause Diversified customers to turn to the single major competitor. Diversified's good will is impaired by the order and will continue to be so impaired until the issues in this case are resolved.

Defendant DOE has placed great reliance on the fact that no enforcement proceedings have been initiated. Notwithstanding, the nature of the regulations does not allow movants to ignore them. For example, the regulations require recordkeeping and reporting and provide for substantial penalties for noncompliance. Movants do not appear to be in a position to be able to comply and then challenge regulation; rather, it would appear that compliance would put movants out of business. We therefore conclude that movants have shown a substantial threat of irreparable injury.

### 3. Balancing Effects

We have seen the potential effect on movants should we refuse to grant relief at this juncture. We must inquire whether this threat of injury is outweighed by some threat of harm to defendant. Defendant contends that an injunction "would clearly prevent DOE from carrying out its congressionally-mandated responsibilities, i. e., to administer a comprehensive regulatory program, since exemption of a portion of the nation's propane, butane, and isobutane supply would frustrate the agency's ability to allocate and price these substances generally." However, there is no showing that a delay in administration would create any substantial injury. If in the end DOE is successful, it will have the same remedies available as it does now. Moreover, it appears to us, although the issue is not before us, that DOE *does* have authority to regulate the named substances *before* they are delivered to a manufacturer (like Aeropres), thereby in effect regulating deliveries to a distributor (like Diversified). As for allocation, then, DOE is really not affected. As for pricing, DOE has its remedies in the form of penalties.

### 4. Public Interest

Defendant contends that it is in the public interest to allow enforcement of its regulations. While this may be true as a general statement, it does not necessarily apply in a borderline case such as this where the very authority to regulate is at issue. In fact, considering the current social and political climate, it is probable that the public interest is best served by strict interpretation of government regulations. In any event, there is certainly no *disservice* to the public interest possible in granting a preliminary injunction here and now.

### CONCLUSION

■ Having considered at length the record, evidence, and briefs before us, and applicable law, it is evident to us that this is a proper case for a preliminary injunction. Accordingly, the motions are granted and defendant hereby is enjoined from enforcing unreasonable and destructive regulations purporting to control the price of the hydrocarbon content of hydrocarbon aerosol propellants produced or distributed by plaintiffs Aeropres Corporation or Diversified Chemicals and Propellants Company.

### ADDENDUM

While the final draft of our opinion was being typed, we received a copy of a "Joint Motion for Expedited Consideration" of the instant motions, filed on behalf of Aeropres and Diversified. The basis of the motion was the receipt by Diversified of a Proposed Remedial Order (PRO) issued by Defendant, DOE.

Disregarding entirely the pendency of the instant suit, DOE proposes that Diversified immediately reduce its prices; immediately institute detailed recordkeeping; refund to its customers the sum of one million twenty-one thousand, one hundred and sixty-six

dollars and fifty-nine cents ($1,021,166.59), plus interest; and report to the DOE the extent of compliance in quarterly "progress reports." Additionally, failure to file a Notice of Objection to the PRO within ten days of service would constitute implied consent to the issuance of the PRO as a final order.

The PRO is an attempt to enforce the price regulations which the DOE contends apply to hydrocarbon aerosol propellants. As such, the PRO falls within the ambit of the preliminary injunction granted this date, and any attempt to enforce the PRO, including issuing it as a final remedial order, will be deemed a violation of the injunction.

Since we have ruled on plaintiffs' motions for preliminary injunction, the "Motion for Expedited Consideration" is dismissed as moot.