**ATLANTIC RICHFIELD COMPANY, Marathon Oil Company, Mobil Oil Company, and Texaco, Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, Defendant,**

**and**

**Archer–Daniels–Midland Company, Arizona Chemical Company, the City of Harrisburg, Pennsylvania, Hempstead Resources Recovery Corporation, Midwest Solvents Company, Inc. and Refuse Energy Systems Company, Intervening Defendants,**

**and**

**County Sanitary Districts of Los Angelos County; County Sanitation Districts of Orange County Metropolitan Sanitary District of Greater Chicago; City of Ames, Iowa; Department of Sanitation of the City of New York; Municipality of Metropolitan Seattle; and Milwaukee Metropolitan Sewerage District, Intervening Defendants.**

**Civ. A. No. 80–1427.**

United States District Court, E. D. Pennsylvania.

Oct. 31, 1980.

**1302**

Jon A. Baughman, Robert S. Price, Philadelphia, Pa., Akin, Gump, Hauer & Feld, Warren E. Connelly, Daniel Joseph, David Holzworth, Washington, D. C., for Atlantic Richfield Co., Marathon Oil Co., Mobil Oil Corp., Texaco, Inc.; Richard Morse, Atlantic Richfield Co., Los Angeles, Cal., James P. Murphy Marathon Oil Co., Findlay, Ohio, William C. Streets, Mobil Oil Corp., Fairfax, Va., Elizabeth P. Smith, Texaco, Inc., White Plains, N. Y., of counsel.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., Peter Vaira, U. S. Atty., Philadelphia, Pa., C. Max Vassanelli, Michael T. Scott, U. S. Dept. of Justice, Washington, D. C., for defendant U. S. Dept. of Energy; Nancy C. Crisman, O. Ann Horn, Sandra Sherman, U. S. Dept. of Energy, Office of General Counsel, Washington, D. C., of counsel.

Jay F. Lapin, C. Loring Jetton, Jr., Lauren B. Homer, Helen Torelli, Wilmer & Pickering, Washington, D. C., for Hempstead Resources Recovery Corp., Refuse Energy Systems Co.

Philip W. Buchen, J. Paul McGrath, Stanley Smilack, G. Ridgley Loux, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D. C., for Archer–Daniels–Midland Co., Arizona Chemical Co.

Herbert C. Goldstein, City Sol., Harrisburg, Pa., for City of Harrisburg, Pa.

Samuel Efron, Lewis E. Leibowitz, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for Hempstead Resources Recovery Corp.

Edwin W. Hummers, Jr., Marvin Rosenberg, Fletcher, Heald & Hildreth, Washington, D. C., for Midwest Solvents Co., Inc.

Arthur R. Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa., Associate Counsel, for all intervening defendants.

Lee C. White, Robert J. Saner, II, John McE. Atkisson, Gordon M. Thomas, White, Fine & Verville, Washington, D. C., Louis J. Carter, Associate Counsel, Philadelphia, Pa., for County Sanitary Districts of Los Angeles County; County Sanitation Districts of Orange County; Metropolitan Sanitary District of Greater Chicago; City of Ames, Iowa; Department of Sanitation of the City of New York; Municipality of Metropolitan Seattle; and Milwaukee Metropolitan Sewerage District.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This is a suit challenging the validity of the Petroleum Substitute Amendments to

the crude oil "Entitlements Program", 10 C.F.R. Part 211 (1980), of defendant United States Department of Energy (DOE). The "Entitlements Program" is a regulatory scheme for the allocation and price control of crude oil. The challenged regulations provide for the issuance of crude oil "entitlements" to producers and users of domestic petroleum substitutes.

Plaintiff oil companies are refiners of crude oil and marketers of refined petroleum products; defendant–intervenors are municipal and private producers and users of petroleum substitutes.

Plaintiffs challenge DOE's statutory authority to adopt the regulations under the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751–760. Plaintiffs also attack DOE's alleged failure to comply with certain procedural rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553, the Federal Energy Administration Act, 15 U.S.C. §§ 761–786, and the Department of Energy Organization Act, 42 U.S.C. §§ 7101–7352.

Presently before the court are cross–motions for summary judgment. The parties have stipulated that there are no genuine issues of material fact to be resolved and that the matter is ripe for summary judgment. Oral argument on the motions was held on August 29, 1980. For the reasons set forth below, the plaintiffs' motion for summary judgment is denied, and the defendant's and defendant–intervenor's cross–motions for summary judgment are granted.

## I

The Emergency Petroleum Allocation Act (EPAA) confers upon the DOE authority to allocate and control the price of crude oil and petroleum products. The purpose of the EPAA is to "minimize the adverse impacts on the American people and domestic economy of shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system." 15 U.S.C. § 751(b).

DOE's price regulation of crude oil grew out of the controls originally imposed by the Cost of Living Council (CLC) in 1973, 38 Fed.Reg. 22536 (Aug. 22, 1973), pursuant to the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904.[1] The controls established a "two–tier" price system for domestic crude oil. Under the system, imported crude oil and "new" domestic crude oil, defined as oil from properties which were not producing in 1972 and increased production amounts from pre–1973 properties, were permitted to sell at free market world prices. "Old" domestic crude oil, defined as oil produced from pre–1973 producing properties in quantities no greater than 1972 monthly production volumes, was subject to mandatory price controls tied to May, 1973 price levels. The two–tier system was designed to limit domestic prices while providing a financial incentive for increased production.

Following passage of the EPAA and creation of the Federal Energy Office (FEO) the regulations were re–promulgated. 39 Fed.Reg. 1924 (Jan. 15, 1974). Subsequent modifications imposed controls on "new" domestic oil in addition to "old" domestic oil. 41 Fed.Reg. 1564 (Jan. 8, 1976), 41 Fed.Reg. 4931 (Feb. 3, 1976).

Dramatic increases in the price of imported crude oil in 1973 and 1974 widened the disparity between the controlled price for "old" oil and the market price for "new" oil. Acting pursuant to its authority under the EPAA, the DOE promulgated regulations providing for the mandatory allocation of crude oil. Without such regulation refiners with large volumes of, or greater access to, lower–cost "old" oil would gain a competitive advantage over refiners more dependent on higher–cost "new" oil. The major beneficiaries of this "old" oil–"new" oil price disparity were the major integrated oil companies, such as plaintiffs.

The Entitlements Program was designed to insure that all refiners and marketers shared equally in the benefits of price–controlled oil and the burdens of uncontrolled oil. Under the Entitlements Program, DOE allocates domestic price–controlled oil without requiring the oil's physical transfer.

1. Pub.L. 91 379, as amended, reprinted as a note to 12 U.S.C. § 1904.

Allocation is accomplished by means of a paper transfer of rights or "entitlements" to such oil. A refiner secures one entitlement for each barrel of cheap oil it refines. Refiners who have received and who wish to refine more than their proportionate fair share of cheap oil are required to buy additional entitlements from other participants in the program who have received less than their share. The price of an entitlement is fixed by DOE to reflect the price differential between controlled and uncontrolled oil.

The savings on cheap "old" oil are thus shared among all participants in the program in a way which approximates what would have occurred if the "old" oil had been physically shared. As a result, petroleum products derived from expensive imported oil can be priced as if produced, in part, from price controlled domestic oil. As the average price of oil is depressed, alternative fuels become less competitive.

Thus, besides ensuring that the economic benefits of low cost "old" oil are not restricted to those with historical access to such oil, the Entitlements Program also has the effect of creating an economic incentive for the importation of expensive foreign crude oil, and an economic disincentive for the production of petroleum substitutes.[2]

In order to alleviate this market distortion created by the Entitlements Program, DOE has adopted a series of Petroleum Substitute Amendments. The amendments are designed to allocate a portion of the economic advantage of access to price controlled domestic crude oil, in the form of entitlements, to users and producers of certain petroleum substitutes.

The first relevant amendment was proposed by DOE in July, 1977, 42 Fed.Reg. 38599 (July 29, 1977), and provided that any shale oil[3] used by the refiners would be automatically eligible for entitlements on the same basis as was imported oil. In the same notice, DOE requested comments so that it could gather and evaluate information on the possible inclusion in the program, on a case by case basis, of other domestic synthetic liquid fuels. The proposed rule was made final in May, 1978, 43 Fed.Reg. 21429 (May 18, 1978), to be effective July 1, 1978. The May, 1978 notice again solicited comments on possible eligibility for inclusion of synthetic liquid fuels in the Entitlements Program.

DOE thereafter issued a proposed regulation, 43 Fed.Reg. 38844 (Aug. 3, 1978) which later became final as 44 Fed.Reg. 6895 (Feb. 5, 1979). This regulation sets forth the guidelines outlining procedures by which it might make case by case determinations as to the entitlements eligibility of individual petroleum liquid substitutes. The guidelines were intended to preserve DOE's flexibility to decide each particular case upon its own relevant facts and circumstances.

Further amendment was proposed by DOE in May, 1979. 44 Fed.Reg. 32225 (June 5, 1979). DOE sought to extend the automatic allocation of entitlements to include gaseous and solid fuels, in addition to shale oil. The purpose of the proposed regulation was to offset the regulatory bias in favor of petroleum and against non–petroleum fuel which would otherwise continue until DOE's authority to regulate crude oil prices expires on September 30, 1981.

That part of the amendment providing for automatic entitlements to producers of ethyl alcohol derived from biomass for use in gasohol was made final in November, 1979. 44 Fed.Reg. 63515 (Nov. 5, 1979). Also in November, 1979, DOE adopted additional portions of the amendments proposed in May, 1979, providing for automatic inclusion in the Entitlements Program of solid municipal waste and solid derivatives thereof used as fuel, shale oil used for non–refining purposes, and methane gas derived from municipal sewage or landfills. 44 Fed. Reg. 66183 (Nov. 19, 1979). Case by case

2. For a more detailed discussion of the operation of the Entitlements Program, see *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App. 1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App.1975); and Decision and

Order of the Department of Energy, Case Nos. BEA–0268, BEA–0287, BEA–0312, BEA–0316; Aug. 7, 1980.

3. Shale oil is a synthetic crude oil substitute derived from oil shale.

eligibility was extended to include solid fuels derived from non–municipal solid waste and gaseous fuels derived from any solid waste sources. The effective date of the November amendment was made retroactive to June 1, 1979.

## II

### A.

The challenged regulatory amendments are a part of the Entitlements Program promulgated pursuant to section 4(a) of the EPAA, which confers upon the DOE authority to allocate and control the price of crude oil and petroleum products. Section 4(a) provides in pertinent part:

[T]he President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation.

. . . . .

Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States.

15 U.S.C. § 753(a).

Section 5(a)(1) of the EPAA provides that the standard of review set forth in Section 211 of the Economic Stabilization Act of 1970[4] governs the judicial review of regulations issued under the EPAA. Section 211(d)(1) provides that:

no regulation . . . shall be enjoined or set aside in whole or in part, unless a final judgment determines (1) that the issuance of such regulation was in excess of the agency's authority; (2) was arbitrary or capricious; or (3) was otherwise unlawful under the criteria set forth in section 706(2) of title 5, United States Code.[5]

Plaintiffs' argument is based upon the first of the grounds listed for setting aside a regulation, namely, that the Petroleum Substitute Amendments were promulgated in excess of DOE's authority.

In a case involving regulation of natural gas liquids, The Temporary Emergency Court of Appeals[6] (TECA) set forth the test to be met by challengers to the regulatory authority of the Federal Energy Administration (FEA), predecessor agency to the DOE:

"We must consider the FEA's assertion of authority to regulate natural gas liquid under the EPAA in the light of the Act's broadly worded, comprehensive objections, for it is well settled that 'the width of administrative authority must be measured in part by the purposes for which it is conferred . . .' *Permian Basin Area Rate Cases*, 390 U.S. 747, 776 [88 S.Ct. 1344, 1364, 20 L.Ed.2d 312] (1968). . . . The Supreme Court has made it clear that 'in the absence of compelling evidence that such was Congress' intention, [it is] unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes.' *Id.* at 780 [88 S.Ct. at 1366]. . . . Agency action taken in pursuit of a legitimate statutory goal enjoys a 'presumption of validity,' and he who would upset it carries a 'heavy burden.' *FPC v. Texaco, Inc.*, 417 U.S. 380, 389 [94 S.Ct. 2315, 2322, 41 L.Ed.2d 141] (1974) . . ."

*Mobil Oil Corp. v. FEA*, 566 F.2d 87, 93 (Em.App.1977).

The scope of the regulatory authority granted by the EPAA was addressed by TECA in the *Mobil Oil* case. "A proper interpretation of the Allocation Act and its provisions requires recognition of the fact that the authority under Section 4(a) [15 U.S.C. § 753] must be read together with

---

4. Pub.L. 91 -379, as amended, reprinted as a note to 12 U.S.C. § 1904.

5. 5 U.S.C. § 706(2) is a part of the Administrative Procedure Act and establishes the general criteria for judicial review of regulations, orders, and other administrative action.

6. The Temporary Emergency Court of Appeals has exclusive appellate jurisdiction of EPAA cases. *See*, Section 211(b)(1), (2) of the Economic Stabilization Act.

the objectives which the exercise of that authority is to obtain." *Mobil Oil Corp. v. FEA*, 566 F.2d at 94, citing *Cities Service Co. v. FEA*, 529 F.2d 1016, 1022 (Em.App. 1975), *cert. denied* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). TECA has consistently recognized the FEA–DOE's broad discretion and flexibility in its mandated attainment of the objectives of the EPAA. *See, e. g., Marathon Oil Co. v. FEA*, 547 F.2d 1140, 1146 (Em.App.), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977), and cases cited therein at n. 14. Thus the court in *Marathon Oil* held that:

> "[d]etailed powers necessary or convenient to the allocation and pricing authority granted with reference to the petroleum industry did not have to be spelled out, for the Congress, as well as judges, was fully cognizant of the doctrine of implied powers. The mandating of regulations to achieve the broad objectives enumerated in the Act essentially entailed selection on the part of the agency of means in its judgment best suited, as to which the rule of deference for administrative decisions should not be departed from or grudgingly applied ..."

*Id.* at 1146, cited in *Mobil Oil v. FEA*, 566 F.2d at 94. The court further noted that there is even authority, *see, e. g. United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), for the extension of regulatory jurisdiction beyond the express terms of a statute. *Marathon Oil*, 547 F.2d at 1146, cited in *Mobil Oil*, 566 F.2d at 94. TECA has also upheld the DOE's authority under the EPAA to administer crude oil allocation by means of entitlements, *Cities Service Co. v. FEA*, 529 F.2d 1016.

**B.**

The EPAA was enacted by Congress because of its concern about the adverse effect of the energy crisis, brought about by the shortage of domestic and imported oil, on the economy and the public health, safety, and welfare. 15 U.S.C. § 751(a). The statutory language of the EPAA itself makes clear the Act's objectives:

> "(b) The purpose of this chapter is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this chapter shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy."

15 U.S.C. § 751(b).

The legislative history of the Act shows that Congress recognized the need for providing the President with broad administrative flexibility in establishing the details of allocation and price control:

> Administrative flexibility is a prerequisite and, consequently, the Committee has decided to recommend that the Executive be assigned the responsibility for crafting the program pursuant to Congressionally defined (though generally stated) objectives.

Joint Explanatory Statement of the Conference Committee, Conf.Rep. 93–628, 93rd Cong., 1st Sess. (1973), *reprinted in* 1973 U.S. Code Cong. & Ad. News, pp. 2582, 2589.

> [T]he Committee has attempted to state in clear terms what it believes should be accomplished under a mandatory allocation program but has, we believe, been careful to provide the President with adequate flexibility so that he is not straight–jacketed into accomplishing these objectives where it would be inimicable to the public interest.

*Id.*, U.S. Code Cong. & Admin. News 1973 at 2590.

> The President is intended to have full flexibility in devising the most effective and efficient means of meeting the priority of the American people identified in section 4(b).

*Id.*, U.S. Code Cong. & Admin. News 1973 at 2689.

Section 4(b)(1) of the EPAA sets forth the Act's objectives in greater detail, and provides that:

The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health . . ., safety and welfare . . ., and the national defense;

(B) maintenance of all public services . . .;

(C) [and] agricultural operations;

(D) preservation of an economically sound and competitive petroleum industry . . .;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, . . . and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

and for required transportation related thereto;

(H) economic efficiency

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

C.

■ The allocation of crude oil entitlements to producers and users of petroleum substitutes clearly furthers the objectives and purposes of the EPAA and thus falls squarely within the DOE's authority under that Act.

The Petroleum Substitute Amendments do not, as plaintiffs contend, regulate the price or availability of alternative fuels. Rather, the amendments merely make producers and users of alternative fuels eligible to receive some of the economic benefits of the price control of domestic crude oil, for the entitlements program does no more

than allocate those economic benefits. The amendments expand the class of persons who may share in the economic benefits of access to price controlled oil by including producers and users of petroleum substitutes. But, and this is where plaintiffs make their mistake, there is no expansion of the entitlements program to include allocation and control of petroleum substitutes themselves. Thus, the amendments involve only the allocation of the economic benefits of price controlled crude oil, which allocation is mandated by the express language of Section 4(a) of the EPAA. Allocation to petroleum substitute users and producers, while not *expressly* provided for in the EPAA, is *impliedly* authorized by the Act, as expressed in Section 4(b)(1)(I).

Since the amendments do not regulate petroleum substitutes, *Shell Oil Co. v. FEA*, 527 F.2d 1243 (Em.App.1975), in which price controls on service station rentals were invalidated as being without statutory authority, is inapposite. That case held that the FEA could not control the price at which stations were leased because it lacked statutory power to allocate station properties, and the agency may not set price controls on products for which it lacks such authority. By contrast, in the case now before the court, the DOE is allocating crude oil, a product for which it does have statutory authority to regulate.

The conclusion seems inescapable that the DOE would be incapable of attaining the objectives of the EPAA "to the maximum extent practicable" if it lacked authority to include petroleum substitutes within the entitlements program. Indeed, *failure* to enact provisions such as the petroleum substitute amendments would leave the DOE open to the charge that it had neglected its statutory mandate to minimize economic distortion.

The Entitlements Program itself has the economically distorting effect of favoring both importation of foreign crude oil and use of petroleum rather that non–petroleum fuel. This is because refiners of domestic oil who receive entitlements are able to reduce their costs by taking advantage of

the difference in price between "old" and "new" oil. The Petroleum Substitute Amendments are needed to offset this economic distortion otherwise caused by the Entitlements Program. Such "minimization of economic distortion ... and unnecessary interference with market mechanisms" is mandated by the EPAA, Section 4(b)(1)(I). Far from being in excess of the DOE's authority under the EPAA, the amendments are necessary if the DOE is to comply "to the maximum extent practicable" with the EPAA's own statutory guidelines for regulations promulgated pursuant to the Act's mandate.

Without the amendments the Entitlements Program's economic incentive in favor of the importation of foreign oil and against the production of domestic oil and petroleum substitutes would remain in effect. The EPAA, however, was enacted in order to attack the problems of the energy crisis which was precipitated by the shortage of foreign oil. By removing the disincentive to production of petroleum substitutes created by the Entitlements Program, the amendments eliminate an aspect of the program which had served as yet another obstacle to a solution to the energy crisis and the nation's dependence on foreign oil. The artificial cost advantage conferred on the use of crude oil by the price controls on "old" oil and the Entitlements Program, and the resulting disincentive to production of domestic oil and petroleum substitutes, is precisely the type of economic distortion which the DOE is charged with minimizing.

**D.**

It is important to recognize that the validity of the regulation in question depends upon its conformity to the will of Congress and not upon this court's own policy determinations. Any consideration of the desirability of the amendment permitting entitlements for petroleum substitutes and the effect of the court's decision upon the nation's energy program and supply must be measured against the policy choices of the Congress, as expressed in the language of the statute, and not against the policy choices which this court might adopt if it were free to devise its own energy policy. Our determination that the challenged reg-

ulations are validly promulgated rests solely upon an analysis of the language of the EPAA. That the nation's effort to deal with the energy crisis is in fact aided by our decision is a factor which has been considered only to the extent that the goal of establishing a comprehensive energy policy which reduces reliance on imported oil and promotes increased use of domestic oil and petroleum substitutes is an objective of the EPAA, as enacted by Congress.

In addition, the EPAA and the Entitlements Program and Petroleum Substitute Amendments must be viewed in the context of the nation's overall energy policy as established by Congress and the President.

In enacting the Energy Policy and Conservation Act, (EPCA), Pub.L.94–163, which, *inter alia*, extended the EPAA, Congress intended as one of its purposes to "increase domestic oil production and the development and use alternatives to petroleum...." S.Conf.Rep.94–516, 94th Cong. 1st Sess. 117, *reprinted in* 1975 U.S. Code Cong. & Ad. News at 1956, 1958.

The Federal Energy Administration Act (FEAA), 15 U.S.C. §§ 761–786 (1976), set forth a statement of the FEA's functions, since inherited by the DOE. One of the purposes of the Act was "to promote the expansion of readily usable energy sources, and to assist in developing policies and plans to meet the energy needs of the Nation." 15 U.S.C. § 761(a). The FEA was also to provide for a "coordinated and effective approach to overcoming energy shortages." 15 U.S.C. § 761(b).

In creating the DOE by enactment of the Department of Energy Organization Act (DOEOA), 42 U.S.C. §§ 7101–7352, Congress sought to "assume coordinated and effective administration of Federal Energy policy and programs." 42 U.S.C. § 7112. The DOE was established, *inter alia*:

> "to provide for a mechanism through which a coordinated national energy policy can be formulated and implemented to deal with the short–, mid– and long–term energy problems of the Nation; and to develop plans and programs for dealing with domestic energy production and import shortages;

to carry out the planning, coordination, support, and management of a balanced and comprehensive energy research and development program . . . ;

to create and implement a comprehensive energy conservation strategy that will receive the highest priority in the national energy program;

to place major emphasis on the development and commercial use of solar, geothermal, recycling and other technologies utilizing renewable energy resources;

to facilitate establishment of an effective strategy for distributing and allocating fuels in periods of short supply . . . ;

to foster and assure competition among parties engaged in the supply of energy and fuels;

to assure, to the maximum extent practicable, that the productive capacity of private enterprise shall be utilized in the development and achievement of the policies and purposes of this chapter;

. . . "

Since the DOE must act in accord with the requirements of each of these statutes, allocation of crude oil entitlements under the EPAA may not take place in an administration vacuum. Accordingly, the DOE has acted to assure that its actions under the EPAA further, rather than frustrate, the Congressional objectives of the EPAA, as well as of the FEAA, EPCA, and DOEOA.

E.

Plaintiffs have denounced the Entitlements Program as nothing more than an illegal scheme to force them to make private donations to alternative fuel producers who have been selected by the DOE to receive such "subsidies." This characterization simply ignores the fact that even though many regulatory programs impose economic burdens, they are not invalid merely because there are some who are dissatisfied with the placement of the burdens or the flow of the "subsidies."

That is certainly the case with a regulatory scheme such as the Entitlements Program, which seeks to equalize the benefits of access by some refiners to price controlled oil, and the Petroleum Substitute Amendments, which seek to correct the artificial economic distortion created by the Entitlements Program. Of course, some will be benefited more than others by the amendments, but that is precisely their purpose. Those receiving less benefit than others cannot be heard to complain that the regulation is merely a scheme for an involuntary donation on their part to those also deemed to be deserving of entitlement eligibility.

The "burdens" of the Entitlements Program are no more than lawful incidents of a system authorized by the EPAA. Moreover, entitlements payments cannot really be considered donations or subsidies because refiners do not have any legal right to exclusive enjoyment, at the expense of producers and users of petroleum substitutes, to the economic benefits of crude oil price controls. Similar arguments were rejected in *Cities Service v. FEA*, 529 F.2d at 1025, 1029 which held that the Entitlements Program was neither a "taking" nor a "tax."

III

■ Plaintiffs' allegation that the May, 1978 rulemaking, 43 Fed.Reg. 21429 (May 18, 1978), was procedurally deficient is without merit. Despite plaintiffs' contention to the contrary, the DOE adopted the Petroleum Substitute Amendments in full compliance with the rulemaking provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553, and of the FEAA or DOEOA.

A.

To be valid under the APA, notice of a proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The notice must be "sufficient to fairly apprise interested parties of all significant subjects and issues involved," *American Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291, (3d Cir. 1977), and provide enough information so that interested parties may offer informed criticism and comments, *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C.Cir.), *cert. denied,*

426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The notice and comment process enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated. *American Iron & Steel Inst. v. EPA*, 568 F.2d at 291. "But the notice need not contain 'every precise proposal which [the agency] may ultimately adopt as a rule.'" *Ethyl Corp. v. EPA*, 541 F.2d at 48; *California Citizens Band Assn. v. United States*, 375 F.2d 43, 48 (9th Cir.), *cert. denied* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). Indeed, such a requirement would be absurd, for it would mean that an "agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary. *Intl. Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973). Thus, "the submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different—even substantially different—from the proposed rule." *American Iron & Steel Inst. v. EPA*, 568 F.2d at 293.

Agency compliance with the procedural dictates of § 553 cannot be seriously questioned. The notice of July, 1977, 42 Fed. Reg. 38599 (July 29, 1977), clearly apprised all who may have been interested that synthetic liquid fuels might be included in the final rule, and were not then included in the proposed rule only because the FEA believed that their commercial production was not yet available. The FEA's request for comments with respect to such petroleum substitutes certainly indicated the FEA's interest to study any comments which might be submitted and to include synthetic liquid fuels in the final rule if it learned from the information received that commercial production was available.

In the explanatory discussion accompanying publication of the final rule in May, 1978, 43 Fed.Reg. 21429, the FEA stated that it had reason to believe that synthetic fuels other than oil shale were then currently being, or shortly would be produced. Because of its lack of detailed information at that time concerning production of synthetics and the need for the benefits of entitlements, the FEA indicated that it would establish a case by case mechanism for determining participation by liquid synthetics in the Entitlements Program. 43 Fed.Reg. 21430. Guidelines for such participation were thereafter proposed, 43 Fed.Reg. 38844 (Aug. 31, 1979), and then made final, 44 Fed.Reg. 6895 (Feb. 5, 1979), followed by rulemakings extending entitlement eligibility to gaseous and solid fuels, 44 Fed.Reg. 32225 (June 5, 1979), 44 Fed.Reg. 63515 (Nov. 5, 1979), 44 Fed.Reg. 66138 (Nov. 19, 1979).

Rather than flaunting the APA notice and comment requirement, as plaintiffs contend, the FEA proceeded in a manner completely faithful to the APA. The agency proposed a rule, solicited comments regarding inclusion of other related substances within the scope of the rule, evaluated the comments received, and formulated a final rule encompassing what it learned. The FEA thus "educated" itself before establishing a final rule, thereby conducting itself precisely as the APA contemplates that an agency should operate under § 553.

That the May, 1977 notice was sufficient to alert interested parties to the possible inclusion in the final rule of non–shale oil synthetic liquid fuel is attested to by the fact that the FEA received written comments addressed to that issue, and which supported such inclusion. This fact is strong evidence that the purported lack of notice as to possible inclusion of other synthetics in the final rule resulted from a failure on the part of plaintiffs to so understand the notice of proposed rulemaking rather than a failure on the part of the FEA to adequately provide such notice.

In addition, even if the rule finally adopted after receipt and consideration of the comments was "substantially different" from that proposed in the original notice, an additional round of notice and comment would not be required, nor would the rule necessarily be invalid under the reasoning of *American Iron & Steel Inst. v. EPA*, 568 F.2d at 293, and *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 632. Moreover,

even a less liberal application of the test enunciated in those cases would not lead to a different result since the final rule of May, 1978 was *not* substantially different from that proposed in the July, 1977 notice.

Finally, even assuming that the May, 1977 notice did not provide sufficient notice of the final rulemaking, notice of the possible inclusion of petroleum substitutes was again given, and additional comments solicited, at each stage of the process leading to promulgation of the amendments as finally constituted. Additional comments were requested in May, 1978, 43 Fed.Reg. 21429, 21432 (May 18, 1978), in regard to eligibility of synthetic fuels for the Entitlements Program, and the application process for their inclusion in the program. Procedures for such inclusion were outlined in guidelines proposed in August, 1978, 43 Fed.Reg. 38844 (Aug. 31, 1978) before being made final, 44 Fed.Reg. 6895 (Feb. 5, 1979). Expansion of the Entitlements Program beyond the amendments of May, 1978 to include gaseous and solid fuels was proposed in May, 1979, 44 Fed.Reg. 32225 (June 5, 1979). Comments were requested, and as the preamble to the final rules adopted in November, 1979 makes clear, were considered by the agency. 44 Fed.Reg. 63515, 63516–17 (Nov. 5, 1979); 44 Fed.Reg. 66183, 66184–85 (Nov. 19, 1979).

Notice and numerous opportunities to comment on the advisability of granting entitlements to petroleum substitutes has therefore been provided throughout the rulemaking process which resulted in the formulation of the amendments here challenged. The procedural requirements of the APA, 5 U.S.C. § 553 have thus been satisfied.

B.

There is absolutely no merit to plaintiffs' contention that the procedural dictates of the FEAA have not been followed. 15 U.S.C. § 766(i)(1)(B) and (C) provide that "[n]otice of any proposed rule, regulation, or order ... shall be given by publication of such proposed rule, regulation, or order in the Federal Register" and that "if any rule, regulation, or order ... is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded."

Notice and repeated opportunities to comment were afforded in response to the July, 1977 announcement of proposed rulemaking, 42 Fed.Reg. 38599 (July 29, 1977); the May, 1978 announcement that the agency intended to consider case by case applications for entitlements for certain petroleum substitutes, 42 Fed.Reg. 21429 (May 18, 1978); the August, 1978 proposed guidelines, 43 Fed.Reg. 38844 (Aug. 31, 1978); and the May, 1979 proposed rulemaking, 44 Fed.Reg. 32225 (June 5, 1979). In addition, plaintiffs and all interested parties were provided with an opportunity to participate in and comment at the oral hearing held on July 17, 1979. 44 Fed.Reg. 32225, 32228 (June 5, 1979). It was not until after each of these stages of the comment process was completed, and plaintiffs thereby given ample opportunity to present their views, that entitlements were actually made available to non–shale oil petroleum substitutes by final rulemaking of November, 1979. 44 Fed.Reg. 63515 (Nov. 5, 1979) and 44 Fed. Reg. 66183 (Nov. 19, 1979).

C.

Finally, there is no basis whatsoever for plaintiffs' argument that the DOEOA has not been complied with. 42 U.S.C. § 7191(b)(1) requires that publication of a proposed rule "shall be accompanied by a statement of the research, analysis, and other available information in support of, the need for, and the probable effect of, any such proposed rule...." This requirement is satisfied by the statements accompanying announcement and publication of the first proposed amendment in July, 1977, 42 Fed.Reg. 38599 (July 29, 1977); the May, 1978 announcement that case by case applications would be considered, 43 Fed.Reg. 21429 (May 18, 1978); the February, 1979 announcement of final guidelines for the application process, 44 Fed.Reg. 6895 (Feb. 5, 1979); the announcement and publication of the proposed rule providing for automatic entitlements for certain petroleum substi-

tutes, 44 Fed.Reg. 32225 (June 5, 1979), and the announcement and publication of the final petroleum substitute amendments in November, 1979, 44 Fed.Reg. 63515 (Nov. 5, 1979) and 44 Fed.Reg. 66183 (Nov. 19, 1979). These statements, individually and collectively, detail the reasons for the amendments, their likely effect on the Entitlements Program, the petroleum industry and the nation's energy policy, and the information relied upon by the agency in developing the proposed and final rulemakings. Nothing more is required by the DOEOA, they having complied with the legislative edict.